Anthony F. Giuliano, Esq.
GIULIANO LAW, P.C.
445 Broadhollow Rd. Ste. 25
Melville, NY 11747
(516) 792-9800
afg@glpcny.com

*Attorneys for Defendants*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| HOWARD M. EHRENBERG IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL., | : : : : | Adv. Pro. No. 20-08052 (AST) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ABRUZZI INVESTMENTS, LLC; JOHN PETROZZA, | : | |
| | : | |
| Defendant(s). | : | |

**NOTICE OF MOTION FOR SUMMARY JUDGMENT; DEFAULT JUDGMENT; TO STRIKE; AND OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

**PLEASE TAKE NOTICE**, that upon the annexed Declaration in Opposition to Motion for Summary Judgment and in Support of Motion for Summary Judgment; Default Judgment and to Strike of Anthony F. Giuliano dated March 15, 2022 and the Declaration of John Petrozza, sworn to on March 15, 2022; the Declaration of Lisa Basich sworn to on March 15, 2022 and upon the pleadings and prior proceedings had herein, and upon the papers

submitted by Plaintiff Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion HealthCorp, Inc. *et al.* (the "<u>Plaintiff</u>"), the Defendants Abruzzi Investment LLC and John Petrozza (collectively, the "<u>Defendants</u>"), Defendants in the above-captioned adversary proceeding, hereby opposes the motion for summary judgment filed by Plaintiff and moves for the following relief: (i) summary judgment dismissing the Complaint with prejudice; (ii) default judgment for Plaintiff's failure to answer the Defendants' counterclaim; and (iii) striking the affidavits of Frank A. Lazzara and Edith Wong along with all exhibits filed in support of Plaintiff's motion.

Responsive papers shall be filed with the bankruptcy court and served upon Giuliano Law, P.C. no later than March 25, 2022 at the address below.  Any responsive papers shall be in conformity with the Federal Rules of Bankruptcy Procedure and indicate the entity submitting the response, the nature of the response and the basis for the response.

**PLEASE TAKE FURTHER NOTICE**, that unless timely objections are filed, the Order may be signed without a hearing.


Dated: Melville, New York
      March 15, 2022

                    GIULIANO LAW, P.C.
                    Attorneys for Defendants

          By: <u>*s/ Anthony F. Giuliano*</u>
                    Anthony F. Giuliano
                    445 Broadhollow Rd., Ste. 25
                    Melville, New York 11747
                    (516) 792-9800
                    afg@glpcny.com

Anthony F. Giuliano, Esq.
GIULIANO LAW, P.C.
Attorneys for Movants
445 Broadhollow Road, Ste. 25
Melville. New York 11747
afg@glpcny.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- x

In re:                                                    Chapter 11

                                                          Case No. 18-71748-67 (AST)
Orion HealthCorp, Inc., et al.,                           Case No. 18-71789 (AST)
                                                          Case No. 18-74545 (AST)

                         Debtors.                         (Jointly Administered)


-------------------------------------------------------------------------- x

Howard M. Ehrenberg in his capacity as Liquidating :
Trustee of Orion Healthcorp, Inc., et al.,
CHT : Holdco, LLC, and CC Capital CHT Holdco LLC,

                         Plaintiffs,                      Adv. Pro. No. 20-08052


             v.

Abruzzi Investments, LLC; John Petrozza

                         Defendants.

-------------------------------------------------------------------------- x


**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
DEFAULT JUDGMENT; AND TO STRIKE**

Abruzzi Investments, LLC ("Abruzzi") and John Petrozza ("Petrozza" and collectively

with Abruzzi, the "Defendants") by their undersigned counsel, Giuliano Law P.C., in

opposition to the Plaintiff's motion for summary judgment ("Plaintiff's Motion") and in

support of  Defendant's Motion for Summary Judgment ("Defendants' Motion") pursuant to

Fed R. Civ. P. 56 made applicable to these proceedings pursuant to Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 7056, for an order; (a) granting summary judgment dismissing the adversary proceeding against the Defendants; (b) granting a default judgment in favor of Defendants for costs and legal fees incurred in connection with the adversary proceeding; and (c) for such other and further relief as this Court deems just and proper, respectfully represents as follows.

## PRELIMINARY STATEMENT

On March 16, 2018 (the "Petition Date") the Debtors in this case filed a petition for relief from its creditors pursuant to Chapter 11 of the Bankruptcy Code. The Debtors consist of approximately twenty-two distinct entities. These cases have not been procedurally consolidated but consolidated for administrative purposes only and are being jointly administered. This adversary proceeding ("Adversary Proceeding") seeks to recover as a fraudulent conveyance the transfer (the "Transfer") of funds from a Robinson Brog Leinwand Greene Genovese & Gluck, P.C. ("Robinson Brog") IOLA account (as defined below) to Abruzzi in the amount of $250,000 (the "Funds").

As will be set forth in detail below, Petrozza requested a short-term loan from from Paul Parmar ("Parmar"), the Debtors' officer and controlling shareholder. Petrozza needed the funds to lease property in Florida. Parmar provided wiring instructions to the Defendants and the Funds were thereafter wired to a bank account held by Abruzzi. Ultimately the deal on the lease of the Florida Property fell through and the Defendants advised Parmar that they would like to repay the loan and

requested wiring information so that the funds could be returned. Parmar provided Defendants with wiring instructions, directing that the repayment of the Funds be sent to the account indicated in an email from Parmar. Abruzzi then directed its bank to immediately wire  the Funds pursuant to Parmar's instructions.  However, as alleged by the Plaintiff, the funds were not wired back to the Robinson Brog IOLA account, nor to any of the Debtors' account directly, but to an account in the name of Sunshine Star, LLC ("Sunshine"), an entity allegedly created on behalf of Elena Sartison ("Sartison"), who was allegedly Parmar's girlfriend.

Based on the foregoing, on March 14, 2020, the Plaintiff filed a complaint, (the "Complaint") commencing this Adversary Proceeding seeking to avoid the Transfer as either an intentional or constructive fraudulent conveyance.

What should become apparent almost immediately when reviewing the Complaint as well as the Plaintiff's Motion is that the Plaintiff never once identifies which of the Debtors' funds were actually transferred to Abruzzi.  The Complaint defines the "Debtors" as all the Debtors in this case, however, for example, in paragraph "17" of the Complaint, the Plaintiff alleges Parmar directed the "Debtor" to transfer the funds to Abruzzi, an event that never actually happened, since Parmar, in fact, directed the Debtors' law firm, Robinson Brog, to wire the funds to Abruzzi.  Since the Debtors have not been deemed a single entity, the lack of distinction in the Complaint and in Plaintiff's Motion is fatal since, for example, the Plaintiff must establish that the "Debtor" from whom the Transfer was made was insolvent at the time or that a judgment creditor of the "Debtor" (whichever Debtor

that may be) existed at the time of the Transfer. Plaintiff can establish neither. This lack of clarity plays an additional role in this case, since, as will be discussed in detail below, it can be shown that the Transfer did not come from one of the Debtors at all, but from a non-debtor escrow account maintained by Robinson Brog.

In addition to the fraudulent conveyance component to the Complaint, the Plaintiff is also seeking to disallow two proofs of claim filed by Abruzzi as Claim Nos. 10062 and 10063 on the grounds that they are not compliant with the Bankruptcy Rules, are without evidentiary support and are contradicted by the Debtors' books and records.  Alternatively, Plaintiff argues that pursuant to section 502(d) of the Bankruptcy Code, 11 U.S.C. §502(d) the proofs of claim must be disallowed until the Defendants pay an amount equal to the Transfer.

As will be set forth in detail below, the Plaintiff is not entitled to relief against the Defendants, and Defendants are entitled to summary judgment for the following reasons: (i) Plaintiff fails to produce evidence in admissible form to establish grounds for relief as a matter of law; (ii) the Funds transferred from the Robinson Brog IOLA account were not property of the Debtors' estate but of a non-debtor entity; (iii) the funds were repaid in full; (iv) the Defendants are a "mere conduit"  of the Transfer; (v) the Defendants are not the "initial transferee" of the Transfer; (vi) Plaintiff defaulted in answering the counterclaim and is therefore liable to the Defendants for all costs and legal fees incurred; and (vii) and Abruzzi has valid claims against one or more of the Debtors.

## PROCEDURAL STATEMENT

The procedural history of this case is set forth in the Declaration of Anthony F. Giuliano submitted herewith. There are no genuine issues of facts and Defendants are entitled to all relief requested.

## DEFENDANTS' STATEMENT OF FACTS

1.      In 2013, Petrozza was approached by Parmar and asked to invest over $4 million in an entity known as Constellation Health Investments ("CHI"). Joint Statement of Uncontroverted Facts ("JSOF") No. 5, Defendants' Additional Statement of Uncontroverted Facts ("DSOF") No. 1.  The stated purpose of this entity was to acquire a 100% ownership interest in Orion Healthcorp., Inc. ("Orion"). (JSOF No. 5), (DSOF No. 1) Parmar however did not deposit the funds in an account held by Orion but rather into the Robinson Brog IOLA account for Constellation Health, LLC, a non-debtor entity. (DSOF No. 2) In addition to these funds, Petrozza also paid $300,000 to Orion to cover IPO expenses in connection with his investment in CHI. (DSOF No.3)

2.      In May of 2015, Petrozza sought to lease a house in Florida. (JSOF No. 27) (DSOF No. 24) Petrozza contacted Parmar to seek a short-term loan to cover the amount required by the landlord. (DSOF No. 4) Parmar agreed, and on May 24, 2015, the Funds were sent by wire from the non-debtor escrow account held in the name of Constellation Health/CHT Closing in Robinson Brog's IOLA account to an account in the name of Abruzzi. (DSOF No. 2)

3.      As it turned out, the deal for the lease of the house in Florida fell through and the funds were no longer needed.  (DSOF No. 4) Petrozza then advised Basich to return the money to Parmar as had been promised. (DSOF No. 6) All that was needed from Parmar was

the necessary wiring instructions.    Parmar then had the wiring instructions sent to Petrozza's assistant; Lisa Basich ("Basich") who then directed Defendants' bank immediately wire the Funds as directed by Parmar. (DSOF No.6) Pursuant to Parmar's direction, the Funds were then wired from Abruzzi's bank account. (JSOF No. 8)

4.    Plaintiff asserts that the foregoing transaction subjects both Abruzzi and Petrozza to liability as the recipient of a fraudulent conveyance. In support of his Motion, Plaintiff, sets forth certain facts which he alleges are incontrovertible and support such a conclusion. However, as discussed below, many of the statements of "facts" are not supported by admissible evidence and thus cannot form the basis for summary relief. In fact, Plaintiff's failure to produce admissible evidence is not only fatal to his motion but would also preclude this Court from finding Defendants liable if this matter were to go to trial.

## **ARGUMENT**

### a.    **Summary Judgment Standard**

5.    The summary judgment standard is a familiar one.

> Under Federal Rule of Civil Procedure 56(a), made applicable to this adversary proceeding by Bankruptcy Rule 7056, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

*All. Shippers, Inc. v. Choez (In re Choez)*, No. 15-45404-ess, at *11 (Bankr. E.D.N.Y. Nov. 20, 2017)

6.    Additionally:

> The moving party has the burden of demonstrating the absence of a dispute as to a material fact, and all of the reasonable inferences to be drawn from the underlying facts must be viewed by the court in the light most favorable to the

party opposing the motion. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003). Where the defendant seeks summary judgment, it must demonstrate that there is no genuine dispute as to a material fact as to at least one necessary element of the claim.

*All. Shippers, Inc. v. Choez (In re Choez)*, No. 15-45404-ess, at *11 (Bankr. E.D.N.Y. Nov. 20, 2017)

7.      With respect to the evidence upon which summary judgment may be granted

courts have held that:

> [b]ecause the purpose of summary judgment is to "weed out cases in which 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law,' it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (internal citation omitted); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."); *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("Pursuant to Rule 104(a), the court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion."). Because hearsay evidence that fails to satisfy a hearsay exception is inadmissible at trial, the Court will not consider it in ruling on a motion for summary judgment. Fed. R. Evid. 802; *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir.1991) (hearsay assertion that would not be admissible if testified to at trial is not competent material for a Rule 56(e) affidavit); *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (affirming the district court's grant of summary judgment due to its determination that certain evidence was inadmissible hearsay)

*In re Lyman Good Dietary Supplements Litig.*, 17-CV-8047 (VEC), at *5 (S.D.N.Y. June 22, 2020)

## b.      Plaintiff Fails to Produce Evidence in Admissible Form to Establish Grounds for Relief as a Matter of Law

8.      "It is axiomatic that the supporting or opposing materials submitted on a

motion for summary judgment 'must be admissible themselves or must contain evidence that

will be presented in admissible form at trial.' *Delaney*, 766 F.3d at 170 (internal citations and quotation marks omitted)" *Edwards v. Onondaga Cmty. Coll.*, 5:14-cv-1329 (MAD/DEP), at *9 (N.D.N.Y. June 22, 2016).

9.      Plaintiff's Motion relies on support from the affidavits of Edith Wong ("Wong"), Frank A. Lazzara ("Lazzara"), and Elena Sartison ("Sartison"). Lazzara was Managing Director of FTI Consulting, Inc., a forensic and litigation consulting firm retained by the Plaintiff. Wong is its current Managing Director.  Sartison alleges to be Parmar's former girlfriend.  Through these individuals, Plaintiff seeks to introduce a series of documents essential to prove the elements of his case.  *See*, Plaintiff's Statement of Additional Uncontroverted Facts [Dkt. No. 38].

10.      However, almost none of the documents attached to the affidavits and almost none of the statement contained in the affidavits constitute admissible evidence.[1]  "The Federal Rules of Evidence require that evidence be authenticated, and that requirement is satisfied by 'evidence sufficient to support a finding that the item is what the proponent claims it is.' " Fed.R.Evid. 901(a). Evidence can be authenticated through the testimony of a witness with knowledge that an item is what it is claimed to be. *See* Fed R. Evid. 901(b). *KeyBank v. Color Express Printing, Inc.*, 21-CV-235 (AT)(KNF), at *1 (S.D.N.Y. Oct. 18, 2021).

11.      Neither Wong nor Lazzara constitute a witness with knowledge that the items are what they are claimed to be. By way of example, both Wong and Lazzara include as exhibits various emails to which they were not a party.  See, ASOF Nos. 41, 42, 46, 53, 54, and 55. These emails are incapable of authentication by either Wong or Lazzara and are therefore inadmissible.

> To authenticate a document, "the proponent must produce
> evidence sufficient to support a finding that the item is what its

---

[1] With the possible exception of the text message annexed to the Sartison Affidavit as Exhibit A, none of the other documents are admissible.

proponent claims it is." Fed. R. Evid. 901 (a). With regard to emails, text messages, and other electronic communications recently sent or received, this is ordinarily not a difficult task, but it does require a *specific* attestation, by a person with personal knowledge of the communications, that they are authentic (*i.e.*, that they were actually sent to or received from the indicated person(s)) and that any printout or other version submitted to the court is a true copy of the original electronic messages. *See, e.g.*, *Bell v. Rochester Gas & Elec. Corp.*, 329 F. App'x 304, 306 (2d Cir. 2009) (affirming district court ruling excluding email printout at trial where there was no evidence that "the email was ever sent or received" through the relevant corporate email system); *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007)

*Deptula v. Rosen*, 20-CV-2371 (JPC) (BCM), at *3 n.1 (S.D.N.Y. Oct. 16, 2020)

12.    Clearly, neither Wong nor Lazzara have the ability to authenticate any of the emails attached to their affidavits.  Similar infirmities apply to the remaining exhibits, which include among other things, bank statements and Robinson Brog billing statements.

Authenticating a document means, in simple terms, that the witness can testify from <u>his own</u> first-hand knowledge why he knows the document before him is what the proponent of the document says it is. It is obviously a waste of time to attempt to ask a witness to authenticate documents where he is neither the author, recipient or for some other reason has <u>first hand</u> knowledge about the exhibit. (emphasis in original)

*Shell v. Henderson*, Civil Action No. 09-cv-00309-MSK-KMT, at *5 (D. Colo. Mar. 19, 2013)

13.    Additionally, neither Lazzara nor Wong have been designated experts in this case.  As a result, they are precluded from giving any opinion whatsoever as to the meaning or import of any of the documents attached to their affidavits. *See* Fed. R. Evid. 703.

14.    Furthermore, the documents annexed to the Wong and Lazzara affidavits are hearsay and are likewise inadmissible on those grounds.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Hearsay is "inadmissible unless made admissible by a federal statute, the

Federal Rules of Evidence, or other rules prescribed by the Supreme Court." *Porter* 722 F.3d at 97; Fed. R. Evid. 802.

*In re Lyman Good Dietary Supplements Litig.*, 17-CV-8047 (VEC), at \*5 (S.D.N.Y. June 22, 2020).

15.     As for Sartison, while she may be able to testify to certain facts for which she has personal knowledge, she cannot testify as the accuracy or authenticity of the M&T Bank statements annexed to her affidavit as Exhibit "B", since she admits in her affidavit that Sunshine was set up exclusively by Parmar and all bank statements were sent to Parmar's residence and not to her.

16.     Plaintiff attempts to introduce through the affidavits of Wong, Lazzara, and Sartison documents necessary to establish the following facts: (i) approximately $12,740,000 was transferred out of Debtor Constellation Healthcare Technologies, Inc.'s ("CHI") bank account and into the Robinson Brog IOLA account on various dates (PSOF No. 37); (ii) approximately $5,590,000 was transferred out of Debtor Orion HealthCorp., Inc.'s ("Orion") bank account and into the Robinson Brog IOLA account (PSOF No. 38); (iii) in fiscal year 2014, $23,000,000 borrowed by Orion was deposited into the Robinson Brog IOLA account (PSOF No. 39); (iv) on May 24, 2017 Parmar directed Mitchell Greene at Robinson Brog to wire $250,000 from the Robinson Brog IOLA account to Abruzzi (PSOF No. 53); (v) on May 25, 2017 Robinson Brog confirmed the wire transfer of the Funds from the IOLA account (PSOF No. 55); (vi) the M&T Bank account was opened to pay Sartison money after being assaulted by Parmar (PSOF No. 56); and (v) the M&T Bank account for Sunshine Star, LLC was closed October 16, 2017 (PSOF No. 59).

17.     Since the out-of-court statements contained in these documents are being used to establish the truth of the matters asserted by Plaintiff, they are hearsay and inadmissible

unless an exception applies which would allow their admissibility.  No such exception is present or pled by the Plaintiff.

18.     For example, one exception commonly used is known as the business-records exception to the hearsay rule ("BRE").  However, that exception is inapplicable here.

> Under the business-records exception, "a record of an act, event, condition, opinion, or diagnosis" will be admitted as hearsay if all of the following criteria are established: (1) "the record was made at or near the time by . . . someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a business"; (3) "making the record was a regular practice of that activity"; and (4) "all these conditions are shown by the testimony of the custodian or another qualified witness." Fed. R. Evid. 803(6)(A)-(D).

*Miss Jones LLC v. Stiles*, No. 17-cv-1450 (NSR), at *2-3 (S.D.N.Y. Aug. 13, 2020)

19.     In addition, the foregoing criteria must be established by a "custodian or another qualified witness". *See* Fed. R. Evid. 803(6)(D). Neither Wong nor Lazzaro are custodians or otherwise qualified witnesses with respect the documents attached to their affidavits.  For instance, (i) neither Wong nor Lazzaro are employees of M&T, Bank of America or JPMorgan Chase Bank; (ii) Lazzaro did not prepare the 2014 Audited Consolidated Financial Statement prepared by Rosenberg Rich Baker Berman & Company, nor is he an employee of that company; (iii) nor are Wong or Lazzaro employees of the Debtors or of Robinson Brog. In short, neither Wong nor Lazzaro are competent to speak as to the accuracy, authenticity or trustworthiness of the documents annexed to their affidavits.  The Second Circuit has held that the business record exception rests upon the trustworthiness and reliability of such records. *Saks International, Inc. v. M/V "Export Champion"*, 817 F.2d 1011, 1013 (2d Cir. 1987) ("The principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of

trustworthiness to be considered reliable."). *Kokoska v. City of Hartford*, No. 3:12-cv-01111 (WIG), at *5 (D. Conn. Sep. 23, 2014).

20.    Defendants' objection to the pedigree of the documents produced by the Plaintiff is neither speculative nor a mere litigation strategy, but instead stem from the very real concern that some, or all, of the documents may have been altered or forged.  Plaintiff admits time and time again that this case is replete with evidence of fraud on the part of Debtors and documents that have been altered or are forgeries. *See*, JSOF  and PSOF Nos. 10, 11, 12, 13, 16, 17, 43, 44, 56.  As outlined in Plaintiff's Brief, some of the acts of fraud and forgeries include: (i) CHT purportedly acquired Pheonix Health, LLC  for $14,000,000 which "was a fictitious entity" (Brief at ¶ 24); (ii) CHT purportedly acquired Northstar Acquisition, LLC for $18,000,000 "which was a fictitious entity" (Brief at ¶ 25); (iii) CHT purportedly acquired MDRX Medical Billing, LLC for $28,000,000 "which was a fictitious entity" (Brief at ¶ 26); and (iv) in order to perpetrate a fraud , fictitious entities were created to represent fictitious equity in Lexington Landmark Services, LLC  which "was not a legitimate business [and] Petrozza'a signature was forged and [Petrozza] never gave Robinson Brog authority to receive funds on behalf of such entity. Plaintiff's Brief at ¶ 29.

21.    Further, as set forth in the Petrozza Declaration, during the course of the Plaintiff's deposition of Petrozza, he was presented with a series of documents which were determined to be altered or forged, including some of Abruzzi's own bank statements *See,* Petrozza Declarations ¶ 16.

22.    In short, any documents in this case must be carefully vetted and authenticated to confirm that they are the genuine article given the rampant fraud apparent in this case. Wong and Lazzaro simply lack the ability to do so. As a result, their affidavits along with their exhibits must be stricken. Without these affidavits and documents, Plaintiff cannot establish an entitlement to summary judgment.

### c.      The Funds Transferred to Abruzzi were Not Property of the Debtors

23.      Plaintiff maintains that the Funds transferred to Abruzzi were property of the estate.  This is belied by the documentary evidence.

24.      On June 26, 2018, this Court entered an order on a motion to quash a subpoena seeking non-debtor records held by Robinson Brog [Dkt. No. 336], which directed the release of information regarding those non-debtor accounts. The order includes a list of "non-debtors". That list includes the CHT Closing account. On June 28, 2018, counsel for Robinson Brog sent a correspondence to counsel for the Debtor which included the unredacted Robinson Brog IOLA Quick Report ("IOLA Report"). In that correspondence, counsel for Robinson Brog states that "Robinson Brog continues to hold funds in two subaccounts that were designated as Non-Debtor only: CHT Closing and Paul Parmer." [2]  (DSOF No. 10)

25.      On July 24, 2018, Plaintiff deposed Roger A. Raimond, Esq., a partner at Robinson Brog.  During the course of the deposition, Raimond identified the IOLA Report as one produced by Robinson Brog which identifies individual escrow accounts held at Wells Fargo bank which includes both debtor and non-debtor accounts. DSOF No. 9.

26.      As evidenced by that report, the Funds wired to Abruzzi were taken from the CHT Closing account which has been identified as a non-debtor account.

27.      Plaintiff readily acknowledges that the funds held in an attorney escrow account remain the funds of the client whose money is being held therein. *See,* Plaintiffs Brief, ¶ 39.

> An Interest on Lawyers Account is an unsegregated interest-bearing deposit account… for the deposit by an attorney of "qualified funds". NY Jud. Law § 497(1). "Qualified funds" are

---

[2] This document was produced by Plaintiff in response to Defendants' discovery demands along with the affidavit of Roger A. Raimond, Esq.

monies received by an attorney in a fiduciary capacity from a client or beneficial owner. The debtors' funds sitting in an IOLA account are the funds of the debtor as they are not property of the law firm who has no dominion or control over them. *See State Farm Mut. Auto Ins. Co. v. Grafman*, No. 04-cv-2609(NG) (SMG), 2017 US Dist. LEXIS 154290, 2017 WL 4217122 (E.D. N.Y. Sept. 221, 2017). *See In re Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2017 Bankr. LEXIS 4145, pg. 11 [law firm was not free to use the client's funds in escrow for its own benefit, and had it done so, the guilty attorneys undoubtedly would have been disciplined and possibly prosecuted for stealing client funds. Hence, the law firm was not a transferee].

Plaintiff's Brief, ¶ 39

28.     As the evidence clearly establishes, the Funds transferred to Abruzzi  came from the Robinson Brog IOLA account for CHT Holding which is a non-debtor account, and therefore the transfer of these Funds cannot constitute a fraudulent conveyance. *See, In re Easyriders, Inc.,* Case Nos. SV 01-16836 KT (Easyriders, Inc.), SV 01-16838 KT (Paisano Publications, Inc.) (Jointly Administered under No. SV 01-16836 KT), Adversary No. AD 05-01375 MT., AD 05-01376 MT (Consolidated under AD 05-01375 MT), [Formerly Adversary Proceeding Nos. AD 02-01623 AG and AD 03-01296, which were consolidated under Adversary Proceeding No. AD 02-01623 AG], at *10 (Bankr. C.D. Cal. May 18, 2006) ("Funds that are not property of the Debtor's estate at the time of transfer cannot be the subject of a fraudulent transfer claim.").

29.     The burden is on the Plaintiff to establish the funds are an asset of the estate. *See, Pirrotti v. Respironics, Inc.*, CIVIL ACTION No. 3:11-CV-00439, at *10 (D. Conn. Mar. 12, 2013) ("It certainly stands to reason that, if the party seeking to set aside a conveyance as fraudulent bears the burden of proof, that burden includes the threshold showing that the property in question was an "asset" under the statute."). Since a debtor must have legal or equitable title in the transferred property prepetition, ". . . the use of another's property to pay a creditor of the debtor cannot be a fraudulent transfer." *Fluharty v. Duet (In re Summit*

*III, LLC)*, No. 2.11-bk-01448, at *6 (Bankr. N.D.W. Va. Jan. 28, 2016). Plaintiff's vague and unsubstantiated assertions that the "Debtors" may have some interest in the Funds do not make those funds property of the estate and they certainly were not property of the estate at the time of the transfer in 2017.

### d.    Plaintiff Cannot Establish a Creditor Existed at the Time of the Transfer

30.    Plaintiff asserts that, at the time of the Transfer, lawsuits and judgment creditors existed against the "Debtors." This is not correct. As Plaintiff's documents establish and by Plaintiff's own admissions, only two lawsuits had been commenced prior to the Transfer and **none** of those lawsuits involved all the Debtors. (JSOF Nos. 31, 32, and 33)

31.    The first lawsuit was filed in 2015 in the United States District Court for the Southern District of Texas against Debtor Orion only. That lawsuit resulted in a judgment against Orion. (JFOS No. 31)

32.    The second lawsuit was filed in 2016 in the Supreme Court of the State of New York against only two of the Debtors – Physician Practice Plus, LLC and Constellation Healthcare Technologies, Inc. – and a judgment was entered in that case after the Transfer took place. (JSOF #32 and 33)

33.    Aside from the obvious fact that, as discussed above, the Funds did not belong to any of the Debtors but rather to a non-debtor entity, it is also a fact that no lawsuit or judgment exists against all the "Debtors." Since Plaintiff does not identify which "Debtor" the Funds are alleged to have been transferred from, he cannot establish the existence of a creditor of the "Debtor" from which the Funds came. This is fatal to the Plaintiff's case.

> Section 544(b) "gives the trustee the power to avoid transfers or obligations of the debtor that are avoidable by an *actual, existing* unsecured creditor under nonbankruptcy law." 5 Collier on Bankruptcy ¶ 544.02 (Alan N. Resnick Henry J. Sommer eds. 15th rev. ed. 2006). Thus, **"[i]f there are no creditors against whom the transfer is voidable . . . the trustee is powerless to act"** and "[t]he burden is on the trustee to demonstrate the

existence of an actual creditor with a viable cause of action. "Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman, 277 B.R. 20, 28 (S.D.N.Y. 2002) (quotation marks and citations omitted); see also In re 9281 Shore Road Owners Corp., 187 B.R. 837, 851-52 (E.D.N.Y. 1995) (noting that "the trustee must demonstrate that there existed an actual unsecured creditor at the time of the transfer . . . whose shoes the trustee may step into so as to avoid the transfer under applicable state law"). (emphasis added)

*Global Crossing Estate Representative v. Winnick*, No. 04 Civ. 2558 (GEL), at *20-2 (S.D.N.Y. Aug. 3, 2006)

34.    Here, the Debtors' cases have never been substantively consolidated, but merely procedurally consolidated and are being jointly administered.  Thus, each bankruptcy estate remains separate and distinct from the others with different creditors in each. Plaintiff's generalization that there exist creditors of **all** the Debtors is thus incorrect as a matter of law.

35.    "Joint administration is distinguished from substantive consolidation because it is simply a procedural consolidation designed for administrative convenience and does not affect the substantive rights of the creditors of the different estates." In re I.R.C.C., Inc., 105 B.R. 237, 238 (Bankr. S.D.N.Y. 1989).

The power to [substantively] consolidate is one arising out of equity, enabling a bankruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation.

*In re Continental Vending Machine*, 517 F.2d 997, 1000 (2d Cir. 1975); *see also In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988) (substantive consolidation is "no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights.") (citations omitted); *In re Cooper*, 147 B.R. 678 (Bankr.D.N.J. 1992) (substantive consolidation more extensive relief than "piercing the corporate veil", since it is complete merger of legal entities for bankruptcy distribution purposes).

*In re Deltacorp, Inc.*, 179 B.R. 773, 777 (Bankr. S.D.N.Y. 1995)

36.     Without substantive consolidation, each creditor remains merely a creditor of a particular debtor which owes an obligation to that creditor.  Since the Plaintiff cannot identify which Debtor the Funds were taken from, the Plaintiff cannot meet its burden to establish the existence of a creditor necessary to maintain this action.

**e.     Defendants Returned the Funds**

37.     Assuming, *arguendo,* that the Funds transferred to Abruzzi constitute the funds of one of the Debtors, Plaintiff cannot maintain a cause of action against Defendants since Abruzzi returned the Funds.

38.     As discussed above, Petrozza requested a short-term loan from Parmar in order to lease a property in Florida.  Parmar agreed and caused the funds to be wired to Abruzzi's bank account.  The Funds were never used by Abruzzi or Petrozza and remained in Abruzzi's account. (DSOF No. 5)

39.     Once the Funds were no longer necessary, Petrozza contacted Parmar to obtain banking information to return the Funds.  By email dated June 26, 2017, Parmar provided Basich with wiring instructions to return the Funds. (DSOF No. 6) Basich then contacted Abruzzi's bank to have the Funds wired from Abruzzi's bank account to Petrozza's bank account so that the money could be immediately wired as directed by Parmar. (DSOF No. 7)

40.     Plaintiff maintains that the Funds transferred to Abruzzi were never repaid and therefore there is a lack of fair consideration for the Transfer.  This is legally incorrect. It is axiomatic that a payment made to a third party at the request of another is a payment to the party to whom the money is owed. *See United States v. Britt,* 335 F.2d 907, 911 (5th Cir. 1964). In *Britt* the Court stated:

> In *Blalock v. Georgia Ry. Electric Co.*, 5 Cir., 246 F. 387, 390, this court said: "A creditor as truly receives payment of what is due him when, pursuant to his direction, the debtor makes

> payment to another, as he does when payment is made directly
> to himself." This case was cited with approval in Old Colony Tr.
> Co. v. Commissioner, 279 U.S. 716, 730, 49 S.Ct. 499, 73 L.Ed.
> 918.

*United States v. Britt,* 335 F.2d 907, 911 (5th Cir. 1964)

41.    A similar conclusion was reached by the Court in *Matter of Sakel*, 21 A.D.2d

666, 667 (N.Y. App. Div. 1964) where that court noted:

> Applicable, rather, is the general rule that a payment of a debt
> to one other than the creditor will be effectual to discharge
> the debt if the payment to the third person is directed to or
> consented to by the creditor. (See 70 C.J.S., Payment, § 4; 3
> Am.Jur.2d, Agency, §§ 106, 107, 125, 127, 130.)

42.    Once Abruzzi expressed the intent to repay the Funds, the fact that the Funds

were misdirected by Parmar does not change the fact that the Funds were repaid.  The better

way to understand this transaction is that, once directed by Parmar to send the funds to a

specific bank account, and the funds are actually sent, the Defendants are deemed as a

matter of law to have repaid the Debtors.  In effect, Abruzzi did not transfer the Funds to

Sunshine, Parmar did. Defendants had no say in where the Funds were directed but were

merely following the instructions given to them by Parmar, who, was CEO of the Debtors

with the authority to direct its funds. As the CEO of the Debtors, Parmar could direct the

payment be sent to any other entity and that entity is deemed the authorized agent to receive

the Funds.

> "[P]ayment requires both the receipt of funds by the creditor and
> the intention of both parties that funds should constitute
> payment." *U.S. Bank Nat'l Ass'n v. Whitney,* 81 P.3d 135,
> 140 (Wash. Ct. App. 2003) (citing *Thrifty Supply Co. of
> Seattle, Inc. v. Deverian Builders, Inc.,* 475 P.2d 905, 907 (Wash.
> Ct. App. 1970)). "Payment to an authorized agent will operate as
> a discharge of the indebtedness, though the agent
> misappropriate[s] the payment." *Petersen v. Pac. Am. Fisheries*,
> 183 P. 79, 80 (Wash. 1919). "Where the principal has clothed [an]
> agent with the indicia of authority to receive payment . . . the
> purchaser is warranted in paying the price to the agent at the

time of sale." *Id.*; *see also Smith v. Hansen, Hansen & Johnson, Inc.*, 818 P.2d 1127, 1132-33 (Wash. Ct. App. 1991) ("An agent's exercise of [actual or apparent] authority results in the principal's being bound."). Thus, a creditor receives payment when the debtor remits funds to the creditor's authorized agent. *See id.*

*Revitalization Partners, LLC v. Equinix, Inc.*, No. C16-1367JLR, at *7-8 (W.D. Wash. Mar. 2, 2017)

43.     The characteristic of this case that differentiates it from other garden variety fraudulent conveyance actions is that the Defendants offered and intended to return the Funds but were deceived by Parmar into wiring the Funds to a specific bank account such that the Funds were not returned to the transferor.  Would it be any different if Parmar directed the Funds to be transferred back to the Robinson Brog IOLA account, and then Parmar immediately transferred them to Sunshine? Could the Defendants be liable in that instance?  Are the mere mechanics of this transaction solely to determine whether the Transfer was a fraudulent conveyance?  The answer must be no.

**f.     Defendants are a "mere conduit" of the Transfer**

44.     Following the logic in the above section, at the point in time when the repayment of the Transfer to the Debtors was directed to a third party (Sunshine), the Defendants were acting as a "mere conduit" for Parmar's ultimate transfer of the funds to Sunshine. To address this issue, the case of *Jalbert v. Gryaznova (In re Bicom NY, LLC),* 619 B.R. 795 (Bankr. S.D.N.Y. 2020) is illustrative.

45.     In *Bicom*, the trustee sought to avoid a conveyance from the joint owner of an account into which the co-owner deposited funds and then transferred those funds to a third party.  The trustee argued that, since the joint owner exercised "dominion and control" over the account, the co-owner could not be a "mere conduit". The Court disagreed. The *Bicom* court found that the joint owner was not an "initial transferee," since the whole point of the

"dominion and control" test is to ensure that a "transferee" distinction is grounded in the realities of the transaction *Id*. at 799.

46.     In *Bicom*, the joint owner did not know about the use of her account and did not receive a benefit from the transfer. Here, a similar conclusion can be reached, since once Abruzzi requested information to repay the obligation and Parmar sent such information, the Defendants did not know the funds were being sent for any other reason than to repay the debt owed. Nor did Abruzzi benefit from the transfer since **all** the funds were then transferred away in a manner consistent with the direction of Parmar. The real recipient and the only party that benefitted was Sunshine. It is curious why no such lawsuit was brought.[3]

47.     In making its determination, the *Bicom* court relied on the Second Circuit decision in *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey* , 130 F.3d 52 (2d Cir. 1997). In *Finley Kumble*, the trustee sought to recover from an insurance broker funds which were placed into the insurance broker's bank account and then ultimately transferred to the insurance company. The Second Circuit, in rejecting the notion that the insurance broker was an "initial transferee" subject to strict liability, found instead that the broker was a "mere conduit." In so doing the Second Circuit came to the following conclusions.

48.     First, "Numerous courts have recognized the distinction between the initial recipient — that is, the first entity to touch the disputed funds — and the initial transferee under section 550." *In re Finley*, 130 F.3d 52, 56 (2d Cir. 1997).

49.     Second, "…the person who is the recipient is the one to whom the funds ultimately should go. Every Court of Appeals to consider this issue has squarely rejected a

---

[3] It is both odd and troubling that the Plaintiff failed to sue Sunshine or its owner, Sartison, to recover the funds she admits to having received. One is left to speculate as to Plaintiff's motive for not doing so and such favored treatment of Sartison casts doubt the veracity of her affidavit.

test that equates mere receipt with liability, declining to find 'mere conduits' to be initial transferees" *In re Finley*, 130 F.3d 52, 57 (2d Cir. 1997).

50.     Finally, the Defendants cannot be shown to have acted in bad faith since they merely repaid the funds as directed by Parmar.  There is no evidence of any kind which would show that the Defendants acted in anything but good faith in making the transfer as directed.

51.     The liquidation trustee in Bicom appealed the bankruptcy court's decision. The district court affirmed the bankruptcy court's decision and dismissed the appeal. In so doing, the district court carefully analyzed the concept of the "initial transferee" to determine whether the defendant in that case should be found "strictly liable" for the money that passed through her account.

> The Code does not define the words "initial transferee," but the Second Circuit in order to avoid the results that would obtain from giving the term too narrowly literal a meaning, has drawn a distinction between an initial transferee and a "mere conduit" through whom the money passes on its way to an ultimate transferee. *SeeChristy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57 (2d Cir. 1997); *see also Bonded Financial Servs., Inc, v. Eur. Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988) ("'Transferee' is not a self-defining term; it must mean something different from 'possessor' or 'holder' or 'agent'"). "The statutory term is 'transferee' - not 'recipient.'" *Finley*, 130 F.3d at 56. This means that the initial transferee -- the party who is strictly liable under § 550(a)(1) - will not necessarily be "the first entity to touch the disputed funds." *Id*. Nor is this approach limited to the Second Circuit. "Every Court of Appeals to consider this issue has squarely rejected a test that equates mere receipt with liability." *Id*. at 57.

*In re BICOM NY, LLC*, 20-CV-8022 (JSR), at *6 (S.D.N.Y. July 26, 2021)

52.     Having determined that a distinction exists between a "recipient" and a "transferee", the district court then goes on to examine the concept of the "mere conduit" and how such a concept differentiates a "recipient" from an "initial transferee". While the district court recognizes that the Second Circuit has adopted the "dominion and control" test to

distinguish between these two concepts, the district court also recognizes that such test does not "call for [an] extremely formulistic application." *Id.* at 7. Rather, the district court found:

> The doctrine has its roots in equity, and it thus requires this Court to consider notions of fairness and practicality. Before the advent of the modern form of this doctrine, bankruptcy courts often did automatically treat the first recipient of fraudulently transferred funds as the "initial transferee," even if that recipient was a mere courier or conduit for the funds. *Finley*, 130 F.3d at 56. These courts would "then look to the exercise of their equitable powers to excuse innocent and casual 'initial transferees' from responsibility under § 550(a)." *Id.* After Finley, bankruptcy courts now essentially reverse the order of those steps, exercising some discretion in defining the initial transferee but then holding that whoever then remains an initial transferee is strictly liable. *See, e.g.*, *In re Moskowitz*, 85 B.R. 8, 10-11 (E.D.N.Y. 1988) (collecting cases in which courts "refused to characterize parties facilitating certain commercial transactions or payments as initial transferees"). The current approach is more faithful to the text of § 550 (a), but its purpose is indistinguishable from that of the previous iteration of the doctrine: to excuse "innocent and casual" entities from potentially "great and unimagined liability" for a fraudulent transfer. *Finley*, 130 F.3d at 56. This history informs the Court's application of the doctrine here.

*In re BICOM NY, LLC*, 20-CV-8022 (JSR), at *7-8 (S.D.N.Y. July 26, 2021)

53.     Thus, it is not merely a formulaic approach that determines whether a recipient of funds is an "initial transferee" subject to strict liability but a more tempered a reasoned approach that includes an analysis of real-life factors to determine the true nature of the transfer.

> Moreover, in describing the dominion and control standard, various courts of appeals have confirmed that the search for formal legal rights must be tempered with a dose of reality. As noted above, the Second and Seventh Circuits have described dominion and control as "*minimum* requirement of status as a 'transferee, '" thus confirming that the technical right to use the disputed funds is not, in every circumstance, sufficient to confer liability under § 550(a) (1) . *Finley*, 130 F.3d at 57 (emphasis added); *accord Bonded Financial*, 838 F.2d at 893. The Ninth Circuit, where the law is similar, has framed the concept of dominion as "legal title to [the funds] and the *ability to use*

> *them*," a description that seemingly invites lower courts to consider both formalistic and practical criteria in their application of this case law. *Universal Serv. Admin. Co. v. Post-Confirmation Comm, of Unsecured Creditors of Incomnet Commc'ns Corp. (In re Incomnet Inc.)*, 463 F.3d 1064, 1071 (9th Cir. 2006) (emphasis added); *see also Bear, Stearns Sec. Corp, v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 15-16 (S.D.N.Y. 2017) (quoting *Incomnet* with approval). And both the Eighth and Ninth Circuits have expressed skepticism that a more formulaic standard is satisfied where a purported transferee is "completely unaware of the existence of [the] funds" that a trustee seeks to recover. *Walsh v. Townsquare Assocs. (In re Montross)*, 209 B.R 943, 949 (9th Cir. 1997); *see also Luker v.* Reeves (In re Reeves), 65 F.3d 670, 675-76 (8th Cir. 1995).

*In re BICOM NY, LLC*, 20-CV-8022 (JSR), at *8-9 (S.D.N.Y. July 26, 2021)

54.    In the present case, there are really three transfers taking place. The first transfer is the transfer of the Funds at Parmar's direction from the CHT Closing Account to the Abruzzi bank account. The second transfer to Abruzzi occurs when Parmar provided the wiring instructions to Defendants. Because Abruzzi intended to repay the loan and followed Parmar's instructions, Abruzzi relinquished all rights to the Funds and that moment is deemed to have "returned" or "repaid" the loan the Defendants received. The third transfer occurs when the "returned" or "repaid" Funds are then directed by Parmar to Sunshine.  At that point. Defendants became "mere conduits" of the "third" transfer, namely the transfer from Parmer to Sunshine.  Parmar, who was the CEO of the Debtors, provided wiring instructions to Defendants' employee, Basich, who executed those instructions with the understanding that they were repaying the loan they received. Instead of taking the Funds back and redistributing them to Sunshine, Parmar directed them to be sent to Sunshine. This transaction is the equivalent of Parmar having received the Funds back from the Defendants, and then sending them himself to Sunshine or sending them back to Defendants with the explicit direction that they then be immediately sent to Sunshine. Defendants had no say in where the money went and had the Defendants not followed Parmar's wiring instructions,

they would have been liable to Parmar or the Debtors for a breach of the oral contract between the parties. "[O]ral agreements are binding and enforceable absent a clear expression of the parties' intent to be bound only by a writing." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 109 (2d Cir. 2003) (citation omitted)." *Klein v. Frenkel*, 14-cv-2719 (ADS)(AYS), at *6 (E.D.N.Y. May 30, 2017). "When money is lent, the law will imply a promise by the borrower to repay it. A debt is created due and payable immediately, without any demand." *Payne v. Gardiner*, 29 N.Y. 146, 175 (N.Y. 1864)

55.    The bankruptcy court in *Bicom* noted: "The problem with the Trustee's approach in this case is that it pushes legal fictions to extremes that make no sense and that are inconsistent with the teachings of the *Finley Kumble* decision" *Jalbert v. Gryaznova (In re Bicom NY, LLC)*, 619 B.R. 795, 799 (Bankr. S.D.N.Y. 2020). The same is true here. Defendants are put in a catch-22.  If they don't follow Parmar's instruction, then they breach the oral contract, and if they do, they can be sued down the road for a fraudulent conveyance.

56.    The district court also noted that, in all cases cited in support of his motion, the recipient of the funds transferred had received and disbursed the funds "for the express purpose of defrauding creditors." *Jalbert v. Gryaznova (In re Bicom NY, LLC)*, 619 B.R. 795, 801 (Bankr. S.D.N.Y. 2020)

57.    Finally, stripping away the mere formality of the *Bicom* liquidating trustee's argument and arriving at the kernel of the transaction, the district court found that ". . . the 'transfer' that BICOM intended to make, and did make, was a transfer to Kings Automotive [here Sunshine], not to Ms. Gryaznova [here Defendants]. The joint account was just a brief waystation for the funds, not a destination." *Jalbert v. Gryaznova (In re Bicom NY, LLC)*, 619 B.R. 795, 801 (Bankr. S.D.N.Y. 2020)

58.     The same logic must be applied here. Once Abruzzi agreed to return the funds and Parmar directed the funds to be wired to a certain bank account, Abruzzi was acting as

a "mere conduit" for that transaction. Abruzzi relinquished control over the funds when it acted at the direction of Parmar by following his wiring instruction. As such, Defendants are not liable to the Plaintiff.

### g. Defendants are not "Initial Transferees" of the Transfer and Received the Transfer in Good Faith, For Value and Without Knowledge of the Avoidability of the Transfer

59.    As indicated above, the Transfer occurred not from any of the Debtors' accounts directly (if it came from a Debtor at all), but from the Robinson Brog IOLA account. The Plaintiff alleges that no business justification for the Transfer existed such that it was facially improper. The Plaintiff further asserts that the "fraud in this particular instance involves the misuse of an [IOLA] account of the Debtors' law firm at [Robinson Brog] to obfuscate Parmar's diversion of Debtors' funds." (Plaintiff's Brief at ¶ 1) Plaintiff further contends that Mitchell Greene from Robinson Brog was directed to wire the Funds from any account he chose because "Parmar didn't care which escrow account it came from" Plaintiff's Brief at ¶ 32 and thus presumably made the choice of which account to take the Funds from himself. In light of the foregoing, Robinson Brog must be considered the "initial transferee" of the transfer and not a "mere conduit." *See, In re Harwell,* 628 F.3d 1312 (11th Cir. 2010) (finding that summary judgment on basis of "mere conduit" defense inappropriate given law firm's purported role in the fraudulent transfers). At the very least, Robinson Brog cannot automatically be excluded as an "initial transferee" of the Transfer.

60.    A trustee's recovery under sections 548 is circumscribed by section 550 which provides that "to the extent that a transfer is avoided . . ., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from — (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. §550(a).

61.    There are exceptions to a trustee's ability to recover from initial or subsequent transferees of an avoided transfer. Section 550(b) prohibits recovery from any "transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith and without knowledge of the voidability of the transfer."

62.    In order to avoid a transfer to a subsequent transferee, the Plaintiff must establish that the initial transfer is avoidable (*i.e.,* the transfer of the Debtors' funds to Robinson Brog). Assuming avoidability of the initial transfer is established, the next in line, here the Defendants, may not be found liable since "[s]ection 550(b)(1) shields defendants as immediate transferees from liability if they received the transfers in good faith, for value and without knowledge that the transfers could be avoided by the trustee. 11 U.S.C. § 550(b)(1); Bonded Fin. Servs., Inc., 838 F.2d at 896. " *Mendelsohn v. Roslyn, LLC (In re Leff),* No. 8-19-73377-reg, at \*24 (Bankr. E.D.N.Y. June 21, 2021).

63.    With respect to the first element, "value", courts have held that:

> Value is measured by what the transferee gave up in the transaction and it need not be given to the debtor to qualify. *See Brown Publ'g Co. Liquidating Trust v. AXA Equitable Life Ins. Co. (In re Brown Publ'g Co.),* <u>492 B.R. 610, 619</u> (Bankr. E.D.N.Y. 2013*); Genova v. Gottlieb (In re Orange County Sanitation, Inc.),* <u>221 B.R. 323, 328</u> (Bankr. S.D.N.Y. 1997). It is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." 5 COLLIER ON BANKRUPTCY ¶ 550.03[1] at 550-25 (16th ed. 2019). The Defendants conferred upon Beth occupancy rights in connection with the apartment unit covered by the Leases in exchange for the rental payments thereunder. Beth did not reside in the apartment, but she had the legal right to if she wished. Therefore, the first element is satisfied.

*Mendelsohn v. Roslyn, LLC (In re Leff),* No. 8-19-73377-reg, at \*24-25 (Bankr. E.D.N.Y. June 21, 2021

64.    With respect to the second element, "good faith", courts have held that:

> Good faith is not a defined term under the Bankruptcy Code but an objective, reasonable person test usually applies to determine

whether the transferee took in good faith. *See Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 740 F.3d 81, 90 n. 11 (2d Cir. 2014); *Mazer-Marino v. S.J.P.B., Inc. (In re Thakur)*, 498 B.R. 410, 420-21 (S.D.N.Y. 2013). Good faith depends on "whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose." *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 310 (S.D.N.Y. 2010).

*Mendelsohn v. Roslyn, LLC (In re Leff)*, No. 8-19-73377-reg, at *25 (Bankr. E.D.N.Y. June 21, 2021)

65.   Finally, with respect to the third element, "knowledge", courts have held that:

The Bankruptcy Code does not define "knowledge," but case law has provided that this element does not require a comprehensive understanding of the facts or certainty of voidability. *See Bonded Fin. Servs., Inc.*, 838 F.2d at 898; *In re Robert Plan of N.Y. Corp.*, 456 B.R. 150, 160-61 (Bankr. E.D.N.Y. 2011). There must only be some knowledge of the possibility of avoidance, meaning the transferee must be aware of facts sufficient to either put him on notice the transfer may be avoided or place him in a position where further inquiry is necessary and would likely lead to the conclusion the transfer might be avoided. *See In re CNB Int'l, Inc.*, 393 B.R. 306, 330 (Bankr. W.D.N.Y. 2008) (citing *Mosier v. Goodwin (In re Goodwin)*, 115 B.R. 674, 677 (Bankr. C.D.Cal.1990)). Where a transferee does not have the information required to form an inference of knowledge there is no obligation imposed requiring further investigation of the facts. *See Bonded Fin. Servs., Inc.*, 838 F.2d at 898.

*Mendelsohn v. Roslyn, LLC (In re Leff)*, No. 8-19-73377-reg, at *26 (Bankr. E.D.N.Y. June 21, 2021)

66.   Applying these elements here, the Defendants can show they are not liable to the Trustee since:(1) the Defendants gave value in the form of a contract whereby they agreed to repay the obligation; (2) At the time of the transfer, the Defendants did not know, nor could have known, that the "Debtors" were insolvent (if, in fact they were) or that the transfer was made with a fraudulent purpose; and (3) the Defendants could not have known that the

transfer was avoidable since, among other things, the Defendants paid the Funds back in accordance with the specific instructions of Debtors CEO, Parmar.

**h.    Plaintiff cannot establish that the Transfer Was an Intentional Fraudulent Transfer**

67.    "Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind." *Golden Budha Corp. v. Canadian Land Co. of America,*931 F.2d 196, 201-02 (2d Cir. 1991) (citing *Citizens Bank of Clearwater v. Hunt,*927 F.2d 707, 711 (2d Cir. 1991)); *see also Int'l Shortstop, Inc. v. Rally's, Inc.,*939 F.2d 1257 (5th Cir. 1991), *cert. denied sub nom. Rally's, Inc. v. Int'l Shortstop, Inc.,* 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). In fact, "[s]ummary judgment is exceedingly rare due to the intent element, which, is almost always an issue of fact." *State of New York v. N. Storonske Cooperage Co., Inc.,*174 B.R. 366, 390 (N.D.N.Y. 1994).

68.     "Because intent is difficult to establish on a summary judgment basis, courts rarely grant judgment on such claims. *In re Bottone,* 209 B.R. 257, 264 (Bankr.D.Mass.1997)" *Agai v. Mihalatos (In re Mihalatos)*, 527 B.R. 55, 69 (Bankr. E.D.N.Y. 2015)

69.    Here, Plaintiff cannot establish that the Transfer was made with fraudulent intent either under 11 U.S.C. §548 or under state law.

70.    Looking first to federal law, the Plaintiff fails to establish all the element of an actual fraudulent conveyance under 11 U.S.C. §548(a)(1)(A).  According to that section a transfer may be avoided as actually fraudulent if (1) the debtor had an interest in the property transferred; (2) the transfer occurred within two years of the petition date; and (3)

the transfer was made with actual intent to hinder, delay or defraud a creditor. *See* 11 U.S.C. §548(a)(1)(A).

71.     As discussed above, the Plaintiff cannot establish the first element, namely, that the Debtors had an interest in the property transferred.

72.     As to the third element, the Plaintiff cannot establish that the transfer was made with actual intent to hinder, delay or defraud a creditor because: (i) as discussed above, there is no creditor in existence to be hindered, delayed or defrauded; and (ii) there is no basis to establish actual intent assuming there was a creditor to hinder, delay or defraud.

73.     It is uncontroverted that the Transfer was made at the request of Petrozza to obtain a short-term loan from Parmar.  Parmar did not initiate the request to transfer the Funds or ask Defendants to hold the Funds for him.  He simply responded to Defendants' request.  It is impossible to conclude, therefore, that Parmar orchestrated the Transfer as a scheme to hinder, delay or defraud anyone.  He was simply loaning money. There is no evidence that this Transfer was motivated by any other purpose.

74.     Perhaps the most glaring error in the Plaintiff's analysis is that, based on his own witnesses and documentation, Sunshine was created **after** the money was loaned to the Defendants and **after** the alleged assault on Sartison. *See,* Sartison Affidavit. So, the Plaintiff would have us believe that Parmar, apparently utilizing his powers of prognostication, transferred the Funds to Defendants a month before allegedly assaulting Sartison and needing to pay her off, which is the purported reason that Sunshine formed qne the Transfer made.  This is simply not plausible.

75.     A similar reason applies to defeat Plaintiff's state law claims.  N.Y. DCL § 276 provides that "[e]very obligation made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors" N.Y. DCL § 276.

76.     Given the difficulty in proving actual intent, Plaintiff relies on the so-called "badges of fraud" to assert that via circumstantial evidence, this Court can conclude that the Transfer was made with intent to defraud. The Plaintiff asserts that the following "badges of fraud" exist to suggest that the Transfer was made with fraudulent intent. However, as will be shown below, none of them are appliable here.

77.     The Lack or Inadequacy of Consideration.  Plaintiff asserts that there was no consideration for the Transfer.  That is incorrect. It is well settled law that a "promise to repay constitutes adequate consideration." *Oved v. Weiner*, 17-CV-1348 (DRH)(GRB), at *18 (E.D.N.Y. Dec. 21, 2017). Here Defendants promised to repay Parmar for the Loan.  Thus, there was adequate consideration.

78.     The Family, Friendship or Close Associate Relationship between the Parties. Plaintiff relies of statements made by Petrozza that, in 2013, he considered Parmar a friend. That was four years prior to the Transfer.  There is nothing to suggest that the two remained close friends to the degree that their relationship would constitute a "badge of fraud".  In fact, the Plaintiff does not cite to a single case that holds that a relationship among friends constitutes a "badge of fraud".  While caselaw recognizes that a "close familial relationship" can be a potential "badge of fraud," to expand that reasoning to casual friends is improper.

79.     Retention, benefit and Use of the Property in Question. As detailed above, the Defendants did not use, benefit or retain the property in question.  The loan was meant to assist Petrozza in leasing property in Florida.  That deal fell through.  When that happened, the funds were not necessary and Petrozza contacted Parmar to return the Funds.  This occurred approximately one month after the Funds were received.

80.     The Financial condition of the Party Sought to Be Charged. The Defendants required the Funds exclusively for the purpose of qualifying for a lease of property in Florida.

The Defendants were in precisely the same financial condition before and after the Transfer because the Funds were not retained by the Defendants.

81.     <u>The Existence or Cumulative Effect of a Pattern or Course of Conduct after the incurring of Debt</u>. Plaintiff looks to establish a pattern of conduct on the part of a pattern or practice of transactions such that the transfer may be concluded to be part of a "scheme" after the incurring of debt.  No pattern can be established here as this represents a single transaction with the Defendants and there is no evidence that there was even a creditor in existence to defraud.

**i.     The Transfer is not fraudulent under NY Debtor Creditor Law § 273-a as no judgment against the "Debtors" can be established**.

82.     Plaintiff repeatedly refers to Debtor and Debtors interchangeably throughout the course of this case.  But, as discussed above, there are 22 separate and distinct Debtors in this case, each with their own unique set of creditors (although some creditors may overlap).

83.     As of the date of the Transfer, the Plaintiff can show that only **one** judgment existed – namely, the Texas Judgment.  And, as discussed previously, the Texas Judgment is against only a single Debtor, Orion.

84.     Since the Plaintiff never identified which of the Debtors' funds were allegedly transferred to the Defendants, the Plaintiff cannot ever establish whether that Debtor had an unsecured creditor or not.  Moreover, since the evidence clearly establishes that the Funds did not actually belong to any of the Debtors, no cause of action exists under N.Y. DCL §273-a.

85.     Finally, although not relevant in light of the fact that no creditor exists, Plaintiff misreads the case law governing the "good faith" component of N.Y. DCL §272.

86.    Plaintiff asserts that "fair consideration" must include a good faith component on the part of both the transferor **and** the transferee.  That is incorrect.  The good faith component requires either (a) property is conveyed in good faith; **or** (b) property is received in good faith. So, while it is true that good faith is required when applying (a) or (b) of N.Y. DCL §272 it is not required that **both** (a) and (b) apply.  As the court in *Sardis v. Frankel*, a case cited by Plaintiff, held:

> To prevail on their claim that the conveyance of the subject condominium apartment meets the requirements of Debtor and Creditor Law § 273–a, defendants must demonstrate that Sofia was a good-faith seller of the property under section 272 **or** that Michael Frankel was a good-faith purchaser for fair consideration without knowledge of any fraud under section 278 ( *see Gitlin v. Chirinkin,* 98 A.D.3d 561, 562, 949 N.Y.S.2d 712 [2d Dept. 2012] ). Where the transferor has knowledge of a judgment, the transfer of funds available to satisfy the judgment made at the judgment debtor's direction will be set aside as lacking in good faith ( *see Berner Trucking v. Brown,* 281 A.D.2d 924, 925, 722 N.Y.S.2d 656 [4th Dept. 2001] ). Likewise, where the transferee is aware of an impending enforceable judgment against the transferor, the conveyance does not meet the statutory good faith requirement and generally will be set aside as constructively fraudulent ( *see Matter of Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria v. Upstate Bldg. Corp.,* 262 A.D.2d 981, 692 N.Y.S.2d 285 [4th Dept. 1999] ).

*Sardis v. Frankel*, 978 N.Y.S.2d 135, 141 (N.Y. App. Div. 2014)(emphasis added)

87.    Leaving aside the issue that not all of the Debtors had judgments against them, the fact that the Defendants took the Funds in good faith and could not have known about the judgment against Orion (if that matters at all) means that Plaintiff cannot meet the elements under N.Y. DCL § 273-a.

88.    On a final note, Plaintiff asserts that Defendants cannot be shown to have acted in good faith as a matter of law because Defendants are "insiders" of the "Debtors". *See* Plaintiff's Brief at ¶ 62.  Again, the vagueness of Plaintiff's allegations and the indiscriminate

use of "Debtors" and "Debtor" points to the insurmountable deficiency of Plaintiff's arguments as a whole.

89.     First, under no set of facts is Petrozza an officer, director, or shareholder of the "Debtors." At most, Abruzzi asserts that it had an interest in Constellation Health Investments, which in turn purportedly had an interest in Orion, but Plaintiff denies this allegation and in fact has asked this Court to expunge Abruzzi's claims.

90.     Based on the foregoing, the Plaintiff fails to meet his burden under N.Y. DCL § 273-a.

**j.     Defendants are entitled to a Default Judgment Against the Plaintiff**.

91.     On May 15, 2020, the Defendants filed an answer to the Complaint containing a counterclaim. (DSOF No. 10) The counterclaim alleges that, since Plaintiff knew or should have known that Defendants repaid Debtors as instructed, Plaintiff is liable for all costs and legal fees associated with defending this action. Pursuant to Fed. R. Civ. P. 12(a)(1)(B) the Plaintiff had 21 days to file an answer. The Plaintiff failed to do so. As a result, the Plaintiff is liable to the Defendants for all legal fees incurred in this case. Given the last-minute filing of this adversary proceeding, mere days away from the statute of limitations, it appears the Plaintiff did not take the time to sufficiently consider the transaction as a whole, or the facts that the Debtors were in fact repaid as a matter of law, no creditor existed at the time of the Transfer, and the Funds are not property of the Debtors. As a result, Defendants are entitled to a judgment against the Plaintiff for all legal fees incurred in this case.

92.     Plaintiff forced Defendants to incur unnecessary legal fees in connection with this Adversary Proceeding and given the facts of this case, Plaintiff will be unable to establish a meritorious defense sufficient to set aside the default.

**WHEREFORE,** Defendants respectfully request this Court enter an order, (1) dismissing Plaintiff's complaint with prejudice; (2) granting a default judgment against the Plaintiff on Defendants counterclaim; and (3) awarding legal fees to Defendants for the costs incurred in defending against this adversary proceeding in an amount to be determined by the Court together with such other and further relief this Court deems just and proper.

Dated: Melville, New York
      March 15, 2022

                    GIULIANO LAW, P.C.
                    Attorneys for Defendants

By: _s/ Anthony F. Giuliano_
                    Anthony F. Giuliano
                    445 Broadhollow Rd., Ste. 25
                    Melville, New York 11747
                    (516) 792-9800
                    afg@glpcny.com