# EXHIBIT D

**Anthony F. Giuliano, Esq.**
**GIULIANO LAW, P.C.**
**Attorneys for Movants**
**445 Broadhollow Road, Ste. 25**
**Melville. New York 11747**
**afg@glpcny.com**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- x

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 18-71748-67 (AST) |
| Orion HealthCorp, Inc., et al., | Case No. 18-71789 (AST) |
| | Case No. 18-74545 (AST) |
| Debtors. | (Jointly Administered) |

-------------------------------------------------------------------------- x

| | |
|---|---|
| Howard M. Ehrenberg in his capacity as Liquidating : Trustee of Orion Healthcorp, Inc., et al., CHT : Holdco, LLC, and CC Capital CHT Holdco LLC, | |
| Plaintiffs, | Adv. Pro. No. 20-08053 |
| v. | |
| Parmjit Singh Parmar a/k/a Paul Parmar, et al., | |
| Defendants. | |

-------------------------------------------------------------------------- x

### DECLARATION IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DEFAULT JUDGMENT AND MOTION TO STRIKE

I, John Petrozza, declare, under penalty of perjury, pursuant to 28 U.S.C. §

1746 as follows:

1

1.      I am the manager of Abruzzi Investments LLC and also one of the defendants in this action and as such am fully familiar with the facts and circumstances as set forth herein.  I make this Declaration (the "Declaration") in opposition to Plaintiff's motion for summary judgment and in support of Defendant's cross-motion for summary judgment, default judgment and motion to strike.

2.      Sometime in 2013, I was approached by Parmar to invest in an entity know as Constellation Health Investment, LLC ("CHI"). Parmar explained to me that CHI would in turn fund the acquisition, by Constellation Healthcare Technology, Inc. ("CHT"), of Orion HealthCorp, Inc. ("Orion").

3.      Based on Parmar's representation that I would be a substantial owner of CHI, I agreed to invest over $4 million in CHI and, on or about June 13, 2013 I wired $4 million to a Robinson Brog escrow account as directed by Parmar and his counsel. Annexed hereto as Exhibit "A" is proof of the wire transfer.

4.      In addition, I paid $300,000 to Orion directly to allegedly cover IPO related expenses. Annexed hereto as Exhibit "B" is a correspondence from Robinson Brog to myself regarding the payment to Orion and providing wiring instructions.

5.      Based upon documentation produced by the Plaintiff, my $4 million investment in CHI was in fact transferred to the Robinson Brog IOLA account for Constellation Health, LLC.  *See* Exhibit "E" to the Giuliano Declaration.

6.      It is my understanding that my $4 million was then transferred along with other money to fund the purchase of Orion by CHT. *See* Exhibit "E" to the

Giuliano Declaration.

7.    Several years later, in 2017 I wanted to lease property in Florida. Because I had invested so much money with Parmar already and was at a point where most of my money was locked in investments, I asked Parmar if he could help me giving me a short-term loan to assist me in obtaining the Florida lease. I explained to Parmar that I would only need it for a brief period and would repay the loan right away. He agreed and my assistant Lisa Basich ("Basich") sent wiring instruction to Parmar.  Thereafter, the Funds were transferred to Abruzzi's bank account.  The whole transaction is contained in text messages between myself and Paul Parmar which were saved to my phone.  Annexed hereto as Exhibit "C" is a true and correct copy of the relevant text messages.

8.    Unfortunately, the lease of the Florida property fell through but I was able to lease another property instead.

9.    When the funds were no longer needed, I advised Basich to return the Funds Parmar had previously loaned to me.

10.    Basich then emailed Parmar to request the wiring instructions to return the Funds which Parmar provided. *See* Exhibit "A" to the Basich Declaration

11.    Basich then contacted my bank and asked that the Funds be immediately wired pursuant to Parmar's instructions. *See* Exhibit "B" to the Basich Declaration.

12.    On June 29, 2017, the Funds were wired out of the Abruzzi bank account pursuant to Parmar's instruction. A true and correct copy of the Abruzzi

bank statement showing the transfer of the money is annexed hereto as Exhibit "C".

13.     Flash forward three years later, and both I and Abruzzi are being sued for a "fraudulent conveyance" by the Plaintiff in this case.  The problem with the Plaintiff's case is that I repaid all of the money exactly the way Parmar told me too. If Parmar told me I had to burn the money in the street to pay him back I would have done that too.  It is preposterous to find me liable for a fraudulent conveyance when I merely transferred the Funds I was given by Parmar in the manner Parmar told me to do.  If I didn't repay him like he said, then I am sure Parmar would have sued me for the Funds.

14.     I had no idea that Parmar was doing anything but directing his own money as he saw fit as the CEO of the Debtors.  I didn't know, and still do not know, whether Parmar or the Debtors were insolvent or whether there were judgments against them at the time of the Transfer.

15.     Again, I did not keep the Funds but returned the Funds to Parmar just as I promised. It would be fundamentally unjust for me to have to pay the Plaintiff any money under these circumstances.

16.     In addition to finding about during the course of these proceedings that the Plaintiff alleges that the Funds went to an entity set up by Parmar for the benefit of his girlfriend, but I also learned the several documents I was shown by the Plaintiff during my deposition contained forgeries of my signature as well as altered bank statements. A true and correct copy of the relevant portion of my deposition and the forged and altered documents are annexed hereto as Exhibit "D"

4

and "E" respectively.

17.     I never intended to defraud anybody by borrowing the money from Parmar and I was good to word when I told him I would pay him back.  The fact that Parmar went on to do something with the money that maybe he should not have done is not my fault.  I certainly did not benefit at all in this situation and have been harmed by having to defend this lawsuit.  Meanwhile, the true beneficiary of the transfer which according to the Plaintiff is Sunshine and Sartison get off scot free.  How come the Plaintiff didn't sue the true beneficiary?  What is the real motive for suing me and not Sartison?

18.     In the end I believe this lawsuit is completely improper.  I believe in the interests of fairness and justice this case should be dismissed with Prejudice.  I also believe that I should be awarded legal fees for having to defend this action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of March 2022.

_____

John Petrozza



## Bank of America

H!

BANK OF AMERICA, N.A.
WIRE TRANSFER ADVICE
1 FLEET WAY         PA6-580-04-05
SCRANTON, PA        18507

WX 0000      175 002116 ##01 SP 0.384
ABRUZZI INVESTMENTS LLC
503 CARY AVE
STATEN ISLAND NY 10310-1940

DATE: 06/13/13
DIRECT INQUIRIES TO:
800.729.9473 OPTION 2
ACCOUNT:

PAYMENT DETAIL:     ATS PAYMENT

THE FOLLOWING WIRE WAS DEBITED TODAY:                    USD AMOUNT $4,000,000.00

TRANSACTION REF:    2013061300273671
RELATED REF:        TS20130613040336                     SERVICE REF: 011090
INSTRUCTING BANK:   TRUSTWEB                              IMAD: 20130613B6B7HU2R011090
BENEFICIARY:        ROBINSON BROG LEINWAND GREENE GENOV  ID: TRWB
BENEFICIARY'S BANK: WELLS FARGO BANK, N.A.               ID: 2000045708734
                                                          ID: 121000248

PAYMENT DETAIL:     WIR/BASIL CONROY 2123503709

*For Constellation*

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

875 THIRD AVENUE

NEW YORK, NEW YORK 10022-0123
_____
(212) 603-6300
_____
FAX (212) 956-2164

Adam J. Greene
(212) 603-6399
ajg@robinsonbrog.com

October 2, 2014

**JPETROZZA@VERIZON.NET**

  **Re: Orion**

Dear: John

  As discussed Abuzzi, as with the rest of the investors of Constellation Health, are investing $300,000 into Orion so as to cover IPO related expenses. Please let us know if you have any further questions. The wire instructions are as follows:

| | |
|---|---|
| **Bank Name and Address:** | Wells Fargo Bank, N.A.<br>150 East 42nd Street, 35th Fl.<br>New York, NY  10017 |
| **Account Name:** | **Robinson Brog Leinwand Greene Genovese & Gluck P.C.**<br>**NY IOLA Attorney Escrow Account** |
| **Account Address:** | **875 Third Avenue,  Fl. 9**<br>**New York, NY 10022** |

**Checking Account Number:**     ■■■■8734
**To Send Wire Transfers into Your Account:**
Provide the sender with your account information above (Bank Name, Account Name) as well as the following:
**Checking Account Number:**     ■■■■8734
**Routing#:**        ■■■0248
**For International Wires, the Wells Fargo\* Swift Code: WFBIUS6S**

         Sincerely,

         Adam J. Greene

{00695990.DOCX;1 }

8:38



1175

PP TV

2 People >

May 24, 2017, 4:47 PM

Guys thank you very much for help me out in this pinch. I have a lot riding on the line with this prompt move, and this house is exactly what I wanted and it's perfect

We've been searching forever and can't find anything quite like it, strategic location wise and lay out

So if we do as we said, just quickly transfer $200,000 into my Abruzzi account tomorrow morning, the owner will be satisfied and will close on the lease

Paul Parmar

We will get it done

Text Message

       

8:38

1175

PP
TV

2 People

will close on the lease

Paul Parmar

PP We will get it done

And of course I will return to
$200,000 June 1 back to
Paul

❤️❤️❤️❤️❤️❤️❤️❤️

Paul Parmar

PP Ok done. Send me wire
instructions

May 24, 2017, 8:21 PM

Lisa emailed you around
five today

Abruzzi Investments, LLC
225 Ellis Street
Staten Island, NY 10307

Text Message

8:38

<1175

PP
TV

2 People

Wire Routing <u>026009593</u>
Account # 457018241763

But just in case ;)

**Paul Parmar**

Did not get Lisa's email.

But we will get this done

Thank you very very much
Paul

This means a lot to me

**Paul Parmar**

Done I just loaded the wire
instruction 10am tomorrow
it will be sent

What bank is it

John instructions are
incomplete

Text Message

8:39

< 1175

PP
TV
2 People ›

John instructions are incomplete

Bank Of America

Paul Parmar

Ok cool

Address for the bank

OK I'm getting that now

**Jennifer Tyra**
Assistant Vice President
Client Sales and Service Officer
U.S. Trust, Bank of America Private Wealth
Management
NMLS ID #620218
201 East Washington Street 23rd Floor I Phoenix, AZ
85004
T: 602.523.2317  I  F: 800.976.4996  I MC: AZ1-200-23-03
jennifer.l.tyra@ustrust.com

Life's better when we're connected™

**U.S. TRUST**
Bank of America Private Wealth Management

May 25, 2017, 1:44 PM

Paul Parmar

Text Message

# OPERATING AGREEMENT

## OF

## LEXINGTON LANDMARK SERVICES LLC

This Operating Agreement (this "**Agreement**") of Lexington Landmark Services LLC (the "**Company**"), a Delaware limited liability company is entered into as of the 17th day of November, 2016 by and among the Company and the sole Member whose name is set forth on <u>Exhibit A</u> attached to this Agreement and incorporated by reference in this Agreement.

**WHEREAS**, the Company was organized as a limited liability company pursuant to the Delaware Limited Liability Company Act (the "**LLC Law**"), as amended from time to time, under the name Lexington Landmark Services LLC, and, for that purpose, a Certificate of Formation was filed with the Delaware Secretary of State on November 17, 2016; and

**WHEREAS**, the Company and the sole Member desire to operate the Company in accordance with the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, it is agreed as follows:

**Article I**       **Formation and Name: Office; Purpose; Term**

    a)       **Organization.**   The Company was organized as a limited liability company pursuant to the LLC Law, and a Certificate of Formation was filed with the Delaware Secretary of State on November 17, 2016.

    b)       **Name of the Company.**   The name of the Company is Lexington Landmark Services LLC. The Company may do business under that name and under any other name or names upon which the Member decides.

    c)       **Purpose.**  The Company is organized for any lawful purpose and to do any and all things necessary, convenient, or incidental to that purpose.

    d)       **Term.**   The term of the Company began upon the filing of the Certificate of Formation with the Delaware Secretary of State and shall have a perpetual existence, unless its existence is sooner terminated pursuant to Article VII of this Agreement.

    e)       **Member.**   The name, present mailing address and membership interest of the sole Member is set forth on <u>Exhibit A</u>.

1



EHREN-ABRUZZI 000004

## Article II    Member; Capital; Capital Account and Interests

**1)    Initial Capital Contribution.** The Member contributed to the Company cash or other assets in the amount set forth in <u>Exhibit B</u> for its interest in the Company (the "**Interest**"). The Interests shall be uncertificated and recorded in the books and records of the Company.

**a)    No Additional Capital Contributions Required.** The Member shall not be required to contribute any additional capital to the Company. The Member shall not have any personal liability for any debt, obligation or liability of the Company.

**b)    No Interest on Capital Contributions.** The Member shall not be paid interest on its capital contribution.

**c)    Return of Capital Contributions.** Except as otherwise provided in this Agreement, the Member shall not have the right to receive any return of its capital contribution.

**d)    Form of Return of Capital.** If the Member is entitled to receive a return of its capital contribution, the Company may distribute cash, notes, property, or a combination thereof to the Member in return of the capital contribution.

**e)    Loans.** The Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms as determined by the Member.

## Article III    Profit, Loss, and Distributions

Cash flow for the Company may be distributed to the Member at such times and in such amounts as determined by the Manager. For each Fiscal Year, Net Profits and Net Losses shall be allocated as follows: Net Profits shall be allocated in proportion to a Member's respective interest in the Company. Net Losses shall be allocated in proportion to a Member's interests in the Company. "**Net Profits**" and "**Net Losses**" shall mean the net taxable income or net taxable loss of the Company, respectively, as determined for federal income tax purposes, for each fiscal year of the Company, plus any income that is exempt from federal income tax and minus expenditures that are not deductible in computing federal taxable income and not properly chargeable to capital accounts, in each case to the extent such items are not otherwise taken into account in computing Net Profits or Net Losses.

## Article IV    Management: Rights, Powers, and Duties

**a)    Management.**

i)    The Company shall be managed by the Member (the "**Manager**"). Until a different Manager is designated by the Member, the Manager shall be Sotirios Zaharis. The Manager shall have the full and exclusive right and power to act for and bind the Company.

ii)    The Manager may cause the Company to employ and retain such other persons as may be necessary or appropriate for the conduct of the Company's business, on such terms as the Manager shall determine, including persons who may be designated as officers. The

2

EHREN-ABRUZZI 000005

officers of the Company shall have the titles, powers, and duties delegated to them by the Manager. Any number of titles may be held by the same officer.

iii)    The Manager shall have the power and authority to delegate his right and power to manage and control the business and affairs of the Company to one or more other persons (including one or more committees, managers and agents, employees and/or affiliates of a manager), including delegation by management agreement or other arrangement.

**b)    Liability and Indemnification.**

i)    Except as otherwise provided by law, the Manager, or any delegate of the Manager, shall not be liable, responsible or accountable in any way for damages or otherwise to the Company for any act or failure to act pursuant to this Agreement or otherwise unless there is a judicial determination that (i) such person acted in bad faith, (ii) the conduct of such person constituted intentional misconduct or a knowing violation of law, (iii) such person gained a financial benefit to which he was not legally entitled or (iv) such person failed to perform his duties, in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.

ii)    The Company shall indemnify, defend and hold harmless the Manager, or any delegate of the Manager, from and against any claims, losses, liabilities, damages, fines, penalties, costs and expenses (including, without limitation, reasonable fees and disbursements of counsel and other professionals) arising out of or in connection with any act or failure to act by such person pursuant to this Agreement, or the business and affairs of the Company, to the fullest extent permitted by law; provided, however, that the Manager, or any delegate of the Manager, shall not be entitled to indemnification hereunder if there is a judicial determination that (a) such person's actions or omissions to act were made in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) such person personally gained a financial benefit to which he or she was not legally entitled.

## Article V    Transfers of Interest

The Member may transfer, in whole or in part, its interest in the Company.

## Article VI    Admission of Additional Members

The Member may admit one or more additional members to the Company.

## Article VII    Dissolution, Liquidation, and Termination of the Company

The Company shall be dissolved upon the happening of any of the following events:

i)    upon the consent of the Member;

EHREN-ABRUZZI 000006

ii)      upon the death, retirement, resignation or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company; or

iii)      upon the entry of a decree of judicial dissolution under Section 18-802 of the LLC Law.

## Article VIII   General Provisions

**a)      Applicable Law.**   All questions concerning the construction, validity, and interpretation of this Agreement and the performance of obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware.

**b)      Article and Section Titles.**   The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

**c)      Separability of Provisions.**   Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

**d)      Amendments.**   Amendments to this Agreement may be adopted by the affirmative vote of those Members holding 100% of the membership interest in the Company.

**IN WITNESS WHEREOF,** the Member has executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

MEMBER:

By:_____
John Petrozza

Manager

By:_____
Sotirios Zaharis

4

EHREN-ABRUZZI 000007

## EXHIBIT A

## <u>MEMBER</u>

<u>NAME</u>                    <u>INTEREST</u>
John Petrozza                100%

EHREN-ABRUZZI 000008

## EXHIBIT B

## <u>INITIAL CAPITAL CONTRIBUTION</u>

Ten ($10.00) Dollars.

EHREN-ABRUZZI 000009

Page 118

1    MR. NOLAN: Okay. All right. La Asia,
2  will you show the witness the next document which
3  is the operating agreement. We'll mark that as
4  Exhibit 8.
5      (Deposition Exhibit Number 8 was marked
6  for identification.)
7      THE VIDEOGRAPHER: Sorry to interrupt.
8  In about ten minutes we just got to switch the
9  videotape.
10      MR. NOLAN: Okay. I think we'll probably
11  be through with this group by then.
12      THE WITNESS: I mean, we could take a
13  break now if that helps, and we could start on
14  this when we get back. Because I could use a --
15  just a very quick bite. You know, like three
16  minutes and a bathroom break.
17      MR. NOLAN: Okay. Anthony, I'm fine with
18  that.
19      MR. GIULIANO: That's fine.
20  BY MR. NOLAN:
21    Q    This is the next document. So you can --

Page 119

1  you can come back and if we're not started,
2  Mr. Petrozza, you can look at this operating
3  agreement.
4    A    All right. Very good. So what do you
5  say? Ten minutes?
6      MR. NOLAN: Anthony, fine?
7      MR. GIULIANO: That's fine by me.
8  Whatever you guys agree on.
9      THE WITNESS: Ten minutes is good.
10      THE VIDEOGRAPHER: Okay. This ends media
11  unit number 2 of the video-recorded Zoom
12  deposition of John Petrozza, to be continued with
13  media unit 3. We're going off the record at 2:33.
14      (A recess was taken from 2:33 p.m. to
15  2:49 p.m.)
16      THE VIDEOGRAPHER: This begins media unit
17  number 3 of the video-recorded Zoom deposition of
18  John Petrozza. We are back on the record at
19  2:49 p.m.
20  BY MR. NOLAN:
21    Q    Mr. Petrozza, you are under oath still,

Page 120

1  just the same oath that you would be given in a
2  court of law. Do you understand that?
3    A    Yes, I do.
4    Q    Okay. Excellent. So Exhibit 8 should be
5  in front of you. Have you had a chance to look at
6  that document?
7    A    Exhibit H?
8    Q    8. There's a number at --
9    A    Yes. Yes. Yes, I did. I'm looking at
10  it now. It's Lexington Landmark.
11    Q    Correct. I'll identify it for the
12  record. Exhibit 8 is the operating agreement of
13  Lexington Landmark Services, LLC. And it's Bates
14  stamped at the lower right-hand corner Ehren,
15  E-H-R-E-N, dash Abruzzi 4 to 9. Can you take a
16  look at that document?
17    A    Okay. Formed a company and -- oh, I'm
18  the member, and I own 100 percent. That's nice.
19  Was -- did this company ever do anything?
20    Q    Well, let's kind of walk through it
21  first. Let's take it logically so, you know, we

Page 121

1  can be done on the topic. Have you ever seen
2  Exhibit 8 before today?
3    A    No. We -- me and my attorney discussed
4  it yesterday.
5    Q    Okay. So yesterday would be the -- did
6  you see the operate -- this operating agreement
7  yesterday?
8    A    No. But he told me about it, and my
9  secretary Lisa Basich told me that that's not my
10  fricking signature, and she's 100 percent right.
11    Q    Okay. So let's go to the end of
12  Exhibit 8. It is on the third to the last page.
13  This is on page 00007. Is that your signature?
14    A    Absolutely not.
15    Q    Okay. Does that name Sotirios Zaharis
16  sound familiar?
17    A    Yeah, it does. That's -- oh, wait a
18  second. That's the CFO of Constellation
19  Healthcare.
20    Q    Did you ever meet him?
21    A    Yeah. I think I met him once or twice at

31 (Pages 118 - 121)

Page 126

1  Jersey.
2  MR. NOLAN:  Okay.  All right.  Let's go
3  to -- La Asia, if you don't mind, please, let's go
4  to Exhibit 10.
5  THE WITNESS:  Holy mackerel.  My mind is
6  blown.  My mind is blown.  Just fricking blown.
7  MR. NOLAN:  La Asia, Exhibit 10 is going
8  to be the January 25th, 2017, letter.
9  MS. CANTY:  It's still uploading, but it
10  should be up in a second.
11  MR. NOLAN:  Thank you.
12  THE WITNESS:  This will be Exhibit 10?
13  (Deposition Exhibit Number 10 was marked
14  for identification.)
15  BY MR. NOLAN:
16  Q   Correct.  For the record, when it shows
17  up, Mr. Petrozza, Exhibit 10 is going to be a
18  three-page document.  And it's dated January 25th,
19  2017, and at the bottom right corner it should say
20  Ehren-Abruzzi 30, 31 and 32.
21  A   Robinson Brog, okay.  The document is

Page 127

1  open.  What should I do?
2  Q   The first thing I would like to ask you
3  is, in January 2017 did Abruzzi -- was Abruzzi
4  utilizing the services of Robinson Brog?
5  A   You totally broke up.  Sorry.  I'm bad
6  with digital problems.  Can you repeat?
7  Q   Yeah.  Sure.  In January 2017 do you
8  recall if Abruzzi was retaining Robinson Brog for
9  any legal services?
10  A   Illegal services?
11  Q   No.  Legal.  Legal services.
12  A   It wouldn't surprise me with these guys
13  at this point, but no.  Yes, there was a few
14  things.  I had a -- a lawsuit about some guy I
15  invested in that didn't come through what he
16  promised.  He also was finishing my estate issues.
17  There was -- you know, I used them in various
18  capacities.  In the beginning of 2017 I probably
19  still was.
20  Q   Okay.  And did you individually -- was it
21  you individually or was it Abruzzi or both that

Page 128

1  was retaining Robinson Brog?
2  A   Both.
3  Q   So you think there was a separate --
4  like, was it an estate court contract case and
5  then for your wills and estates?
6  A   Yes.  And there was a settlement with my
7  deceased wife's first children that they managed
8  for me.
9  Q   And what lawyer was handling that at
10  Robinson Brog?
11  A   Adam Greene and some guy David.  Adam was
12  the point guy, and David was, you know, the doer.
13  Q   Okay.  And what about the estate court
14  litigation?  Who handled that at Robinson Brog?
15  A   Adam and David.
16  Q   Okay.  Okay.
17  THE WITNESS:  Just -- I know I'm not
18  supposed to talk when I don't have to talk,
19  Anthony.  I apologize.
20  But I met these guys through Paul in the
21  beginning of the relationship.  I used to go to

Page 129

1  their office.  That's where Paul would be, at
2  Robinson Brog.  Now, the way it was set up, very
3  impressive.  And I was really in disfavor of my
4  previous attorney.  So I just started swinging my
5  legal work to these guys.
6  I didn't think there was a conflict of
7  interest because I didn't see Paul or
8  Constellation as the enemy.  But obviously I was a
9  little fish.  Paul is a big fish.  So my best
10  interest gets squashed by Paul's desires.
11  BY MR. NOLAN:
12  Q   Well, when did Robinson Brog start doing
13  work for either yourself or Abruzzi?
14  A   I'm going to guess, I would say, a year
15  after Paul.  So I would say '14, '15.
16  Q   Okay.  Okay.  If you -- you look at up at
17  the top there, it says, "Our firm has been asked
18  by the following parties" -- and it says Lexington
19  Landmark Services, LLC as one of the entities --
20  "to receive their entire proceeds from the
21  Constellation Healthcare Technologies, Inc.,

33 (Pages 126 - 129)

Wealth Management Banking

 **Merrill Lynch** | **Bank of America**

P.O. Box 15284
Wilmington, DE 19850

**Client service information**

📞 1.800.MERRILL (1.800.637.7455)

TDD/TTY users only: 1.800.288.4408

En Español: 1.800.688.6086

🖥 bankofamerica.com

✉ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

ABRUZZI INVESTMENTS LLC

⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛ - **Advantage Relationship**

for May 22, 2014 to June 20, 2014    Account number: ⬛⬛⬛⬛⬛ 

ABRUZZI INVESTMENTS LLC

## Account summary

| | |
|---|---|
| Beginning balance on May 22, 2014 | ⬛⬛ |
| Deposits and other additions | ⬛⬛ |
| Withdrawals and other subtractions | ⬛⬛ |
| Checks | ⬛⬛ |
| Service fees | ⬛⬛ |
| **Ending balance on June 20, 2014** | ⬛⬛ |

Important disclosure information listed on the "Important Information for Bank Deposit Accounts" page




**Exhibit
PET 0013**

EHREN-ABRUZZI 000116

ABRUZZI INVESTMENTS LLC    |    Account ▓▓▓▓▓▓▓▓ |    May 22, 2014 to June 20, 2014

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

**Change of address** - Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Deposit agreement** - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our banking centers.

**Electronic transfers: In case of errors or questions about your electronic transfers** - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

- Tell us your name and account number.
- Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts client) (20 business days if you are a new client, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting other problems** - You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree to not make a claim against us for the problems or unauthorized transactions.

**Direct deposits** - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled. You may also review your activity online or visit a banking center for information.

Merrill Lynch makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith Incorporated, a registered broker-dealer and member SIPC, and other subsidiaries of Bank of America Corporation.

Banking products are provided by Bank of America, N.A., and affiliated banks, Members FDIC and wholly owned subsidiaries of Bank of America Corporation.

© 2013 Bank of America Corporation

Bank of America, N.A. Member FDIC and  Equal Housing Lender



EHREN-ABRUZZI 000117

# Your checking account

 Merrill Lynch | Bank of America

ABRUZZI INVESTMENTS LLC  |  ▓▓▓▓▓▓▓  |  May 22, 2014 to June 20, 2014

## Withdrawals and other subtractions

| Date | Description | Amount |
|------|-------------|--------|
| | | |
| | | |
| 06/20/14 | MTB    DES:CH-FUH CAPITAL CALL    ID:0688202899 | -9,000,000.00 |
| **Total withdrawals and other subtractions** | | |

To help you BALANCE YOUR CHECKING ACCOUNT, visit bankofamerica.com/statementbalance or the Statements and Documents tab in Online Banking for a printable version of the How to Balance Your Account Worksheet.



EHREN-ABRUZZI 000118

ABRUZZI INVESTMENTS LLC   |   Account # 0038 1780 7574   |   May 22, 2014 to June 20, 2014



EHREN-ABRUZZI 000119

Page 138

1    Q    -- from Paul Parmar.  And it says, "John,
2    Tomer."
3    A    Yes.  I'm looking at it.
4    Q    And it's confirming a $4 million
5    investment.
6    A    Yes.
7    Q    That pretty much matches your
8    recollection of how much you invested; is that
9    correct?
10    A    That's correct.
11    Q    And Mr. Parmar states you're investing
12    into CHI, Constellation Health Investment.  Do you
13    see that?
14    A    Correct.
15    Q    And it states further, "which would own
16    mine and your interest in the acquisition of
17    Orion."
18        Do you know what that means?  Was your --
19    A    Yes.
20    Q    Was that a joint investment that you made
21    for Mr. Parmar as well?

Page 139

1    A    Yes.  There's two people in Constellation
2    Health Investment, my Abruzzi and Paul's company.
3    My $4 million investment got me 60 percent of
4    Constellation Health Investments.  He got 40
5    percent.  Paul is the manager.  And that was used
6    to build Orion/Constellation Healthcare.
7    Q    Did -- did Paul have a separate
8    investment vehicle in Constellation Health
9    Investment, like, such as First United Health?
10    A    That's correct.  That was his vehicle,
11    yes.
12    Q    Okay.  So Paul's vehicle was First United
13    Health?
14    A    Yes.
15    Q    At this time in June 2013, you're friends
16    with Mr. Parmar?
17    A    Yes.
18    Q    Okay.  Did Mr. Vardi have any interest in
19    the investment?
20    A    Just like I said, I had a gentlemen's
21    agreement with Tomer that he would help and manage

Page 140

1    with me along this process.
2        MR. NOLAN:  Okay.  All right.  La Asia,
3    would you go to the next exhibit.  We're going to
4    mark the next exhibit as Exhibit 13.  It's a Bank
5    of America statement from 2014.  It's May --
6    May 22nd, 2014, to June 20th, 2014.
7        (Deposition Exhibit Number 13 was marked
8    for identification.)
9    BY MR. NOLAN:
10    Q    And while you're looking at that,
11    Mr. Petrozza, I'm just going to identify it --
12    A    Okay.
13    Q    -- for the record.  Exhibit 13 is a Bank
14    of America -- pretends to be a Bank of America
15    statement which is Bates stamped in the lower
16    right corner Ehren-Abruzzi 116, and it goes to
17    119.  So why don't you take a look at that.  My
18    first question, whenever you are comfortable with
19    Exhibit 13, is, did Abruzzi Investments, LLC, have
20    a bank account at Bank of America in 2014?
21    A    Yeah.  I'm pretty sure, yes.

Page 141

1    Q    And if you go to the second to last page,
2    it appears to show a $9 million withdrawal from
3    Abruzzi Investments that's marked as CH-FUH
4    capital call.  Do you see that?
5    A    Yeah.  What date is this?
6    Q    This is -- it says June 20th, 2014.
7    A    Yeah.
8    Q    Do you know what that was --
9    A    Now, why is it redacted?
10    Q    This is the document -- actually, if you
11    look at the lower corner, this document was
12    produced by our office, and the document we have
13    is redacted.
14    A    Yeah.  So how come the address for
15    Abruzzi Investments is redacted?
16    Q    This was -- I can represent to you this
17    is the document we found in this form.
18    A    Okay.  Well, I didn't have $9 million in
19    the bank in 2014.  I did have Abruzzi Investments,
20    but, oddly enough -- because I just learned that I
21    have a company on Route 35 in Jersey that got

36 (Pages 138 - 141)

Page 142

1  money and the IRS thinks I got money.
2      So how do I know this is not Abruzzi
3  Investments to another bullshit address, that
4  somebody created a bank account using my company's
5  name? I need to see what's behind the ink.
6      Q   Right. So let's just be clear on the
7  record, then. So you don't have any recollection,
8  as you sit here today, of Abruzzi Investments,
9  LLC, making any $9 million transfer to CH-FUH
10  capital call?
11     A   No, Jeff, I do not.
12     Q   Okay. I'm assuming FUH stands for First
13  United Health.
14     A   Yes. That's right.
15     Q   Did Mr. Parmar ever ask you to modify or
16  redact a document so that it was inaccurate so he
17  could use it to show anyone?
18     A   No. Why -- why would he? He has no
19  trouble doing it himself or whoever is doing the
20  redacting. Whoever is doing any of this shit.
21     MR. NOLAN: Okay. Let's go to

Page 143

1  Exhibit 14. Exhibit 14, La Asia, is going to be
2  e-mails in February 14th, 2017 --
3      THE WITNESS: Hold on, Jeff. Hold on,
4  Jeff. You're telling me you do not have in your
5  big collection of documents, you don't have a
6  non-redacted version of that document?
7  BY MR. NOLAN:
8      Q   That's correct. I located that -- I can
9  represent to you I located that document. And I
10  think there might be an e-mail that goes with it.
11  I just vaguely remember an e-mail, but I'll
12  certainly look for it to try to give you some
13  context of why it was redacted.
14     A   Jeff, if you can, I need to see what's
15  underneath that ink. I need to see it. It's only
16  right. It's my company name, right?
17     Q   Right. I -- all I can tell you,
18  Mr. Petrozza, is I think I can give you a context
19  of why and who redacted it. I just don't have the
20  redaction. So I don't want to be wrong. I
21  believe there's an e-mail that shows this document

Page 144

1  was redacted by Parmar and company. Maybe it's
2  Zaharis. Maybe one of these other guys. But I do
3  not believe I have an un-redacted copy of this or
4  I would have used it for the deposition.
5      A   Well, how come the trustee or the lawyers
6  or the FBI didn't force Parmar to produce a
7  non-redacted version?
8      Q   I did subpoena records -- the trustee did
9  subpoena records from Bank of America. I can go
10  back and try to cross-reference it to see if we
11  have a copy, but --
12     A   I would be tremendously grateful.
13     Q   I will work with your lawyer to be as
14  transparent as I can.
15     A   Okay. Thank you.
16     MS. CANTY: Sorry, Jeff. Can you repeat
17  the exhibit?
18     MR. NOLAN: Yeah. Exhibit 14 is going to
19  be the February 14th, 2017, collection of
20  documents. It's an e-mail from Sam Zaharis to
21  Paul Parmar.

Page 145

1      THE WITNESS: What exhibit number?
2      MR. NOLAN: This next one is going to be
3  Exhibit 14.
4      (Deposition Exhibit Number 14 was marked
5  for identification.)
6  BY MR. NOLAN:
7      Q   Okay, Mr. Petrozza. This document is not
8  short, but it is an e-mail that contains the
9  documents that are referenced in the e-mail, and
10  it is Bates stamped, the lower right corner,
11  Ehren-Abruzzi 251 and it goes to 269. So it's
12  approximately 18 pages. You can just kind of get
13  a flavor for it if you look at it, and then I'll
14  ask you a question.
15     A   Okay. Now, this is because -- this is
16  their attempt to produce documents because they
17  were subpoenaed?
18     Q   No. This is a document that I produced
19  to your lawyer.
20     A   Okay. You have to walk me through it
21  because I -- I don't know.

37 (Pages 142 - 145)