# Exhibit 2

Page 1

1              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF NEW YORK
2    -----------------------------x
     In re:                        : Chapter 11
3    ORION HEALTHCORP, INC.        : Case No.
               Debtors.            : 18-71748 (AST)
4    -----------------------------:
     HOWARD M. EHRENBERG, IN HIS   :
5    CAPACITY AS LIQUIDATING       :
     TRUSTEE OF ORION HEALTHCORP,  :
6    INC., ET AL.,                 : Adv. Pro. No.
               Plaintiffs,         : 20-08052 (AST)
7    vs.                           :
     ABRUZZI INVESTMENTS, LLC;     :
8    JOHN PETROZZA,                :
               Defendants.         :
9    -----------------------------x
10        VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF
11                  JOHN PETROZZA
12   DATE:          TUESDAY, MARCH 2, 2021
13   TIME:          12:11 P.M.
14   LOCATION:      1220 MARITIME CIRCLE
15                  ESSEX, MARYLAND  21221
16   REPORTED BY:   SUZANNE MARIE ALONA ENDERSON, via
                    video conference
17                  Reporter, Notary
18
19
20              Veritext Legal Solutions
             1250 Eye Street, NW, Suite 350
21               Washington, D.C.  20005

Page 2

```
 1              A P P E A R A N C E S

 2

      On behalf of the Plaintiff, via video conference:

 3

              JEFFREY P. NOLAN, ESQUIRE

 4            LA ASIA CANTY, PARALEGAL

 5            Pachulski Stang Ziehl & Jones LLP

              780 Third Avenue

 6            34th Floor

              New York, New York  10017

 7            (212) 561-7700

              jnolan@pszjlaw.com

 8

 9      On behalf of the Defendant, via video conference:

10            ANTHONY F. GIULIANO, ESQUIRE

11            Giuliano Law P.C.

              445 Broadhollow Road

12            Suite 25

              Melville, New York 11747

13            (516) 792-9800

              afg@glpcny.com

14

15

16

17

18      ALSO PRESENT:

19            CODY HENDERSON, Videographer, via video

                 conference

20

              JOSH HOEPPNER, Veritext Tech, via video

21                 conference
```

Page 76

1    when you're talking about the AmEx issue?

2        A    '15 or '16.

3        Q    2015?  2016?

4        A    Yeah.  Right about there.  Maybe -- it

5    may have been, actually, as it was changing to the

6    holidays.  For some reason I remember holidays.

7        Q    So did I hear you correctly that

8    Mr. Parmar had the corporate entity issue cards --

9    black AmEx cards for Mr. Vardi and for yourself?

10       A    Yeah, before -- before, he did it for

11   Constellation because he -- he ended up being a

12   very close friend.  And he would laugh.  We would

13   go out and get a lot of attention using the black

14   card.  And he just said, Hey, do you want one?

15           I'm like, Yeah.  Sure.

16           He said, Yeah.  I'll get you one.  So he

17   got me one.  I said, Just give me the total at the

18   end of the month, and I'll pay it.  I mean, we had

19   a -- most of the -- you have to understand, most

20   of my dealings were not -- I'm friends with

21   somebody, doing business with a friend -- like,

Page 77

1    when I was in trouble, I had no liquid in the

2    marina.  And I needed to come up with $180,000.  I

3    didn't even ask Tomer.

4              And the next day he shows up, and he just

5    gives me a check for $180,000.  He goes, Here,

6    take care of your problem.  Pay me back when you

7    can.  So I paid him back in 45 days.  There's no

8    paperwork.  It was just handshake.  So yeah.  I've

9    always paid my bill.

10             I used his black AmEx, and plus I got to

11   use the concierge and stuff like that.  And so he

12   extended that because -- I think Paul asked for it

13   because he was jealous.  He would see me and Tomer

14   with a black card.  And he was, like, How do I get

15   one for Constellation and my officers?

16             Tomer, being the idiot that he is, said,

17   I'll get you -- I'll get it for you and the

18   officers.  And they used it for, I think, quite

19   some time.

20        Q    Do you recall what name was on the card?

21   I mean, besides your name being on the bottom of

Page 97

1    just shells for Mr. Parmar are also in the

2    bankruptcy cases.  You know, we've sued people

3    that, you know, he -- he secreted money to.  I

4    mean, he probably will say it was justified or it

5    was business related, but -- I mean, there's a

6    number of -- I'm not the only -- we're not the

7    only firm, either.  The trustee has other firms

8    that represent them as well.

9         A    Okay.  Thank you for that explanation.

10        Q    Okay.  So I'm going to show you Exhibit 6

11   now.  It's in front of you.  On the lower right of

12   the document, it's just -- the first page is Bates

13   stamped Defendants' 01093.

14        A    Okay.

15        Q    And this is Exhibit 6.  So the first

16   question when you scroll through is I'm going to

17   go -- ask you to go to the last page and ask you

18   if that's your signature.

19        A    That is my signature.  Yeah, we got one.

20   Let's see what this document is about.  The

21   merger.  Wait.  Is this the go -- what date is

```
 1    this?  '16.  Is this the go-private event?

 2         Q    I think that's an accurate -- I've heard

 3    that referred to as the go-private event, yes.

 4         A    Figures he'd come for my actual signature

 5    when he's giving papers to Chinh Chu.  He won't be

 6    able to play around.

 7         Q    So what do you recall?  Was there a

 8    meeting of the managers of Constellation held for

 9    this go-private transaction?

10         A    Yeah.  Well, he talked about it to me and

11    Tomer quite a bit, you know, in social settings.

12    Then there was a telephone conference of all the

13    managers or board of directors, whatever they

14    called themselves.  That's one of the times I told

15    you where I just didn't even say anything until

16    the end of the call, and I went "yay."

17         Q    Were there multiple meetings for this

18    go-private transaction, or do you recall if there

19    was more than --

20         A    The best of my recollection, as far as

21    telephone conferences of the board of managers, I
```

Page 99

1    think there was two.

2        Q    Were these always on the -- on the phone?

3        A    As far as I'm concerned, I was on the

4    phone.  There may have been people in the same

5    room on the phone call, but I was remote.

6        Q    And -- and did he state to you what the

7    purpose of the go-private transaction was?

8        A    So we could all make a gazillion dollars.

9    He told me that Chinh, with his legacy of

10   Blackstone and growing companies, will turn this

11   into a $2 billion company in 18 to 24 months, and

12   my $4 million investment will bring me 16 to $24

13   million.

14       Q    So 16 to 24 million?

15       A    Yep.

16       Q    Did the go-private transaction ever

17   come -- did it ever happen?

18       A    Yeah.  Yeah.  Sure.  Yeah, it did.

19       Q    Okay.  And did you get back your

20   $4 million investment?

21       A    No.

1    we're, like, No, we want to take the ride.  We

2    want to take the ride.  We don't want to cash out.

3          Then he was, like, Well, why don't you

4    take six now and let four carry, or take four now

5    and let six carry.

6          I'm, like, no, because don't forget, at

7    that point, Tomer and I think Chinh Chu is the

8    real deal because of his track record.  We think,

9    this guy Chinh is going to take the company

10   through the roof.  I don't want to bail now.  You

11   know, the growth is really about to happen.

12         So Paul started, you know -- I started

13   detecting for the first time that he's talking out

14   of both sides of his mouth.  So the last time on

15   this subject, that's when I blew up at Paul.  I

16   threw everything off his table, and I marched out

17   of there.  I says, Go fuck yourself, Paul.  I'm

18   going to go talk to Chinh directly.

19         Then he comes running out as I'm getting

20   out of his house.  Come downstairs.  Let's talk

21   about it calmly.  We'll work this out.

Page 102

1           And so I just -- I held on to my guns.

2    I'm, like, Paul, I want to -- I want to take the

3    ride with you.  You're doing this because it's

4    going to grow.  I want to grow, too.  I want to

5    leave my money in, and I want the growth.

6        Q    Okay.  Up to this point -- this is

7    approximately 2016?

8        A    It's right around when the go-private was

9    happening.

10       Q    Okay.  And did you ever know Mr. Parmar

11   was having financial issues before that time --

12   time frame in 2016?

13       A    I suspected it.  You know, like, he

14   talked -- otherwise, why couldn't he pay credit

15   card bills out of his own pocket, you know?  He

16   was a controlling company.

17          So Paul -- he'll never admit to anything

18   like that.  I noticed the quality of the wine went

19   down during that year.  So maybe that was another

20   indication.

21       Q    Did you ever know his house was in

Page 103

1    foreclosure?

2        A    Yes.

3        Q    And did you know his house had -- it was

4    up for a sheriff's sale and all the possessions in

5    it?  His cars, his -- his art?

6        A    I didn't know about the possessions and

7    cars.  I knew the house was.

8        Q    When do you recollect his house was in

9    foreclosure?  I guess I should ask you, did he ask

10   to borrow money for -- to bail him out of his

11   foreclosure of his house?

12       A    No.  He ultimately put -- yeah, because

13   the company that was formed for me, Aquila Alpha,

14   bought the mortgage -- the note.

15       Q    So you formed Aquila Alpha?

16       A    Yeah.  Well, Robinson and Brog did the

17   paperwork, but yeah.

18       Q    And when was that?  That was in, like,

19   2014?  Was it a couple of years earlier?

20       A    Maybe '15.

21       Q    2015?  And was that a concept of

Page 104

1      Mr. Parmar?  Did he ask you to form Aquila Alpha?

2          A     Yeah.  He did it -- the one time he did

3      the right thing.  The singular time he did the

4      right thing.  He did it so if things didn't go

5      right, I would have something that I would be able

6      to get my initial investment back or his promise

7      of profit back.

8                 So he funded that for my benefit, but we

9      never finished the paperwork.  And it was all, you

10     know, incomplete, and I never had tangible control

11     over it.

12         Q     So Aquila Alpha was formed, and

13     Mr. Parmar put the money in?

14         A     Yes.

15         Q     And he -- did you ever see a document

16     that said that you were the controlling owner of

17     Aquila Alpha?

18         A     Yes, I did, a couple of years later.

19         Q     But at the time, at least, you think

20     he's -- he's being straight up with you?

21         A     Yeah.  I think -- I had a glimmer of

1    hope.  Like, the guy is actually trying to do the

2    right thing for once.

3       Q    Okay.  Did Aquila Alpha actually buy the

4    note for the Colts Neck property out of --

5       A    Yeah.  From -- from Deutsche Bank.

6       Q    Were you involved in that transaction at

7    all?  I mean, did you have to deal with Deutsche

8    Bank at all?  Did you have to, you know, sign any

9    paperwork?  Any of --

10      A    No.  I know Robinson Brog did it on my

11    behalf.  And like I said, it was another

12    gentlemen's agreement which you should only have

13    with gentlemen.  So learn a lesson here.  Well, I

14    should, that because my initial investment of 4

15    when -- when he told me to do it, he promised me

16    to triple my investment.

17           He said that I'm going to fund Aquila

18    Alpha with this problem/solution.  So in the

19    future, if you're not making the kind of profit I

20    promised you, we'll have a gentlemen's agreement

21    that you can, you know, foreclose on my house.

```
 1    And you can take the asset, but don't do anything
 2    until we, you know, hit the -- until I tell you
 3    to.  Don't -- don't foreclose on my house until
 4    I -- I tell you to.  Don't make me homeless.
 5        Q    Okay.  So did Aquila Alpha have a -- did
 6    you ever -- strike that.
 7             Did you ever see Aquila Alpha record a
 8    document against his house?
 9        A    I've seen the document.
10        Q    Okay.  And do you know how much
11    Mr. Parmar funded Aquila Alpha?
12        A    3.5.  3.5 million.
13        Q    3.5 million?
14        A    That's my recollection.
15        Q    And you -- you mentioned Robinson Brog
16    was -- was there a certain lawyer over there that
17    was handling this transaction for Mr. Parmar?
18        A    I would imagine it would be Mitch or Adam
19    Greene.
20        Q    And I've never known this.  Is Adam
21    Greene related to Mitch?
```

1    document, but the ledger entries look familiar.

2        Q    Okay.  Sunshine Star, LLC, can you tell

3    me who that entity is?

4        A    Sunshine would be -- let me remember.

5    Oh, yeah.  Oh, Sunshine.  I borrowed 250 from Paul

6    when I moved to Florida.  And I told him I just

7    needed it quickly.  And he said, sure.  And I

8    think, like, 45 days later I paid it back.  And I

9    just asked Lisa to ask Paul where to send it.  And

10   Paul's instructions was to an account that

11   Sunshine owned.

12       Q    Did you know -- have you heard of

13   Sunshine Star -- well, you -- strike that.

14            Did you know Sunshine Star was affiliated

15   with Mr. Parmar?

16       A    I just -- I -- I didn't think about it.

17       Q    Did you -- did that -- did the topic of

18   who Sunshine Star was ever show up?

19       A    Say that again.

20       Q    Yeah.  Did the -- did the topic with --

21   when Paul said -- strike that.

Page 198

1          Was this a conversation on the phone

2     where Mr. Parmar told you to send the money to

3     Sunshine Star?

4     A     No.  It -- it was -- it was simply when

5     it was time to pay back the money, I told Paul on

6     the phone I could pay it back now.

7          He goes, Okay.  Just have Lisa e-mail me

8     for the instructions.

9          I said, Lisa, e-mail Paul for the

10    instructions.  Paul e-mailed Lisa the instructions

11    where to send it, and Lisa compiled.

12    Q     Okay.  So you had a conversation with

13    Mr. Parmar.  You said you had money back to send

14    to him.  And he said, fine, I'll send Lisa where

15    to send the money?

16    A     Yes.

17    Q     Okay.  This check, it says for June 13th,

18    2013.  It says Robinson Brog.  That's the same law

19    firm that has represented you we've discussed

20    today?

21    A     Yes.

UNANIMOUS WRITTEN CONSENT

OF ALL THE MANAGERS

OF

CONSTELLATION HEALTH, LLC

(Pursuant to the Delaware Limited Liability Company Act Section 18-404)

The undersigned, being all of the Managers of Constellation Health, LLC, a Delaware limited liability company (the "Company"), do hereby consent to the adoption of the following resolutions by written consent in lieu of a meeting as of November __, 2016:

      1.    The Merger.

**WHEREAS**, the Managers of the Company (the "Managers") have determined that it would be in the best interest of the Company to approve the Subscription Agreement to be entered into by the Company, Constellation Healthcare Technologies, Inc., a Delaware corporation; CHT Holdco, LLC, a Delaware limited liability company ("Holdco"); CC Capital CHT Holdco, LLC, a Delaware limited liability company ("CCCHT Holdco"); Alpha Cepheus, LLC, a Delaware limited liability company ("ACLLC"); First United Health, LLC, a Delaware limited liability company ("FUH"); and Paul Parmar, in his individual capacity (the "Subscription Agreement"), in the form annexed hereto as Exhibit A; and

**WHEREAS**, the Managers have determined that it would be in the best interests of the Company to approve the Voting and Support Agreement and Release of Claims (as defined in the Subscription Agreement) (the "Voting Agreement"), in the form annexed hereto as Exhibit B;

**WHEREAS**, the Managers have determined that it would be in the best interests of the Company to approve the Pledge Agreements (as defined in the Subscription Agreement) (the "Pledge Agreements"), in the form annexed hereto as Exhibit C; and

**WHEREAS**, the Managers have determined that it would be in the best interests of the Company to approve the Indemnity and Support Agreement to be entered into by the Company, CHT Mergersub, Inc., a Delaware corporation, Holdco, CCCHT Holdco, CC Capital Management, LLC, a Delaware limited liability company, FUH, ACLLC and Paul Parmar, in his individual capacity (the "Indemnity and Support Agreement"), in the form annexed hereto as Exhibit D.

**NOW, THEREFORE, BE IT:**

{00824166.DOCX;3 }

DEFENDANTS 01093

HIGHLY CONFIDENTIAL

Exhibit
PET 0006

**RESOLVED**, that the Subscription Agreement, the Voting Agreement, the Pledge Agreements, and the Indemnity and Support Agreement, and any other agreements contemplated by the foregoing agreements, and the transactions contemplated thereby, are hereby approved in all respects; and it is further

2.      General.

**RESOLVED**, that the officers of the Company, and such other persons as they designate, and each of them, are hereby authorized, directed and empowered to take such action as may be necessary or appropriate to effectuate the foregoing resolutions and the transactions contemplated thereby; and it is further

**RESOLVED**, that the actions taken in connection with the transactions contemplated by the Subscription Agreement, the Voting Agreement, the Pledge Agreements, and the Indemnity and Support Agreements, and any other agreements contemplated by the foregoing agreements, and the foregoing resolutions, by the officers of the Company, and such other persons as they designate, and each of them, are hereby ratified; and it is further

**RESOLVED**, that the Secretary of the Company is hereby authorized to certify the adoption of the foregoing resolutions.

[SIGNATURE PAGE FOLLOWS]

{00824166.DOCX;3 }

DEFENDANTS 01094

HIGHLY CONFIDENTIAL

**IN WITNESS WHEREOF**, the undersigned have executed this Written Consent as of the day and year written above.

**BOARD OF MANAGERS:**

_____
Joel Plasco

_____
Paul Parmjit Parmar

_____
John Petrozza

_____
Salil Sharma

3

DEFENDANTS 01095

HIGHLY CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the day and year written above.

BOARD OF MANAGERS:

_____
Joel Plasco

_____
Paul Parmjit Parmar

_____
John Petrozza

_____
Sahil Sharma

3

DEFENDANTS 01096

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the day and year written above.

**BOARD OF MANAGERS:**

_____
Joel Plasco

_____
Paul Parmjit Parmar

_____
John Petrozza

_____
Salil Sharma

3

DEFENDANTS 01097

HIGHLY CONFIDENTIAL

P.O. Box 15284
Wilmington, DE 19850

# U.S. TRUST
Bank of America Private Wealth Management

### Client service information

☎  1.800.U.S.TRUST (1.800.878.7878)

🖥  bankofamerica.com

✉  Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

ABRUZZI INVESTMENTS LLC
60 W RIVO ALTO DR
MIAMI BEACH, FL 33139-1254

# Your Business Advantage Checking

for May 1, 2017 to May 31, 2017

Account number:        I 1763

**ABRUZZI INVESTMENTS LLC**

## Account summary

| | | |
|---|---|---|
| Beginning balance on May 1, 2017 | $32,226.16 | # of deposits/credits: 9 |
| Deposits and other credits | 471,673.26 | # of withdrawals/debits: 597 |
| Withdrawals and other debits | -316,968.42 | # of items-previous cycle[1]: 28 |
| Checks | -58,594.26 | # of days in cycle: 31 |
| Service fees | -32.50 | Average ledger balance: $111,720.95 |
| Ending balance on May 31, 2017 | $128,304.24 | [1]Includes checks paid,deposited items&other debits |

Important disclosure information listed on the "Important Information for Bank Deposit Accounts" page.

**Exhibit
PET 0022**

ABRUZ-BOFA 002693

ABRUZZI INVESTMENTS LLC  |  Account #      1763  |  May 1, 2017 to May 31, 2017

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

Updating your contact information - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking. Or, you can call our Customer Service team.

Deposit agreement - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time.  These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals.  Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our financial centers.

Electronic transfers: In case of errors or questions about your electronic transfers- If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can.  We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

- Tell us your name and account number.
- Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (10 calendar days if you are a Massachusetts client) (20 business days if you are a new client, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

Reporting other problems - You must examine your statement carefully and promptly.  You are in the best position to discover errors and unauthorized transactions on your account.  If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree to not make a claim against us for the problems or unauthorized transactions.

Direct deposits - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.  You may also review your activity online or visit a financial center for information.

Banking products are provided by Bank of America, N.A., and affiliated banks, Members FDIC and wholly owned subsidiaries of Bank of America Corporation.

U.S. Trust, Bank of America Private Wealth Management operates through Bank of America, N.A. and other subsidiaries of Bank of America Corporation.

© 2017 Bank of America Corporation

**Bank of America, N.A. Member FDIC and**  **Equal Housing Lender**

ABRUZ-BOFA 002694

## U.S. TRUST

Bank of America Private Wealth Management

**ABRUZZI INVESTMENTS LLC  |  Account #**        1763  |  May 1, 2017 to May 31, 2017

**Your checking account**

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 05/02/17 | Online Banking transfer from CHK 9153 Confirmation# 3573824285 | 20,000.00 |
| 05/11/17 | WIRE TYPE:WIRE IN DATE: 170511 TIME:1824 ET TRN:2017051100393258 SEQ:1328300131ES/014927 ORIG:CC CAPITAL MANAGEMENT LLC ID:700958742 SND BK:JPMORGAN CHASE BANK, NA ID:021000021 PMT DET:OS1 OF 17/05/11 | 100,000.00 |
| 05/12/17 | CHECKCARD  0511 EXPEDIA 7265213369604 EXPEDIA.COM  WA 7401308713205001983 | 1,451.42 |
| 05/17/17 | CHECKCARD  0516 LANDMARK VINEYARDS (WI KENWOOD      CA 7480163713728600063 | 17.46 |
| 05/17/17 | CHECKCARD  0516 LANDMARK VINEYARDS (WI KENWOOD      CA 7480163713728600063 | 17.46 |
| 05/22/17 | WIRE TYPE:WIRE IN DATE: 170522 TIME:1714 ET TRN:2017052200402875 SEQ:5342300142ES/005387 ORIG:SHELDRAKE INTERESTS LLC ID:908192834 SND BK:J PMORGAN CHASE BANK, NA ID:021000021 PMT DET:DCD OF  17/05/22 SHORT TERM LOAN | 100,000.00 |
| 05/25/17 | WIRE TYPE:WIRE IN DATE: 170525 TIME:1139 ET TRN:2017052500249242 SEQ:2017052500073947/008493 ORIG:ROBINSON BROG LEINWAND GR ID:002000045708734 SND BK:WELLS FARGO BANK, NA ID:121000248 PMT DET:1 646 | 250,000.00 |
| 05/26/17 | CHECKCARD  0525 HERTZ RENT-A-CAR HERTZ PPAY   OK 7439121714561300977 | 91.92 |
| 05/30/17 | CHECKCARD  0529 EXPEDIA 7269180446287 EXPEDIA.COM  WA 7469216714900092830 | 95.00 |
| **Total deposits and other credits** | | **$471,673.26** |

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| 05/01/17 | MBFS.COM         DES:Auto Pay  ID:6705903  INDN:Abruzzi Investment      CO ID:1850860002 WEB | -499.00 |
| 05/02/17 | WIRE TYPE:WIRE OUT DATE:170502 TIME:1147 ET TRN:2017050200266700 SERVICE REF:385865 BNF:LISA BASICH ID:912955382 BNF BK:JPMORGAN CHASE BANK, N. ID:0002 PMT DET:TS20170502114723 | -5,000.00 |
| 05/02/17 | WF HOME MTG       DES:AUTO PAY  ID:0159097823  INDN:JOHN T PETROZZA        CO ID:WXXXXXXXXX PPD | -6,371.36 |
| 05/03/17 | WIRE TYPE:WIRE OUT DATE:170503 TIME:1210 ET TRN:2017050300258598 SERVICE REF:006916 BNF:LAURA MCCAULEY ID:0017553488 BNF BK:MANUFACTUR ERS & TRADERS ID:022000046 PMT DET:TS2017050312102 0 | -2,770.00 |
| 05/03/17 | CAREDISCOUNT      DES:INS. PREM. ID:76CD160130  INDN:ABRUZZI INVESTMENTRS L  CO ID:8752242823 PPD | -37.95 |

*continued on the next page*

ABRUZZI INVESTMENTS LLC  |  Account #        1763  |  May 1, 2017 to May 31, 2017

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 05/04/17 | Rosedale BaptSch DES:SchoolPymt ID:  INDN:Laura McCauley        CO ID:6470751402 WEB | -300.00 |
| 05/05/17 | TRAVELERS INSUR  DES:CL PAYMENT ID:3919Y51459999  INDN:INTERACTIVE CLEARINGHO  CO ID:1458911001 PPD | -776.00 |
| 05/09/17 | FREEDOM LIFE INS DES:INS. PREM. ID:52M1143280  INDN:LAURA J MCCAULEY        CO ID:1611096685 PPD | -171.36 |
| 05/15/17 | NYC WATER BD/DEP DES:WATER&SWR  ID:03069188051217  INDN:ABRUZZI INVESTMENTS  CO ID:1133315277 WEB | -3,000.00 |
| 05/15/17 | PA REBILL ACH   DES:ACH TRAN  ID:3P-XXXXXXXXX  INDN:CHRISTOPHER VILLARET   CO ID:1116002815 PPD | -255.00 |
| 05/16/17 | JIVE COMMUNICATI DES:JIVECOMMU  ID:M40103266313  INDN:NAME UNKNOWN         CO ID:1911718107 WEB | -192.98 |
| 05/19/17 | WIRE TYPE:WIRE OUT DATE:170519 TIME:1126 ET TRN:2017051900244697 SERVICE REF:006745 BNF:TICO INVESTMENT VEHICLE IV ID:1502530425 BNF BK:SIGNATURE BANK ID:026013576 PMT DET:TS20170 519112605JOHN PETROZZA | -1,539.00 |
| 05/22/17 | FUNDS TRANSFER DEBIT | -4,000.00 |
| 05/22/17 | Customer Withdrawal Image | -5,565.00 |
| 05/26/17 | NY TLR transfer to CHK 4196 | -20,000.00 |
| 05/26/17 | NY TLR transfer to CHK 2550 | -30,000.00 |
| 05/26/17 | NYC ECB FINES   DES:212-639-96 ID:747953011637  INDN:JOHN PETROZZA       CO ID:AXXXXXXXXX PPD | -1,900.00 |
| 05/26/17 | NATIONWIDE P&C  DES:EDI PYMNTS ID:NBPXXXXXXXXX  INDN:LAURA MCCAULEY       CO ID:1314177102 PPD | -239.15 |
| 05/26/17 | VERIZON          DES:PaymentREC ID:6548798280001  INDN:John Petrozza      CO ID:9783397101 PPD | -161.33 |
| 05/26/17 | ATT              DES:Payment   ID:XXXXXXXXXEPAYU  INDN:abruzzi investments ll  CO ID:9864031004 PPD | -63.56 |
| 05/30/17 | FUNDS TRANSFER DEBIT | -5,000.00 |
| 05/30/17 | NY TLR cash withdrawal from CHK 1763 | -2,500.00 |
| 05/30/17 | WIRE TYPE:WIRE OUT DATE:170530 TIME:1200 ET TRN:2017053000441739 SERVICE REF:010380 BNF:LAURA MCCAULEY ID:0017553488 BNF BK:MANUFACTUR ERS & TRADERS ID:022000046 PMT DET:TS2017053012002 3 | -2,127.00 |
| 05/31/17 | WIRE TYPE:WIRE OUT DATE:170531 TIME:1107 ET TRN:2017053100305267 SERVICE REF:007714 BNF:LUXURY RENTALS MIAMI BEACH ID:2000041544769 BNF BK:WELLS FARGO BANK, N.A. ID:121000248 PMT DET:TS20170531105559JOHN PETROZZA | -162,500.00 |

Card account # XXXX XXXX XXXX 0057

| Date | Description | Amount |
|------|-------------|--------|
| 05/01/17 | CHECKCARD  0428 SOUTH SHORE BAR & GRILL STATEN ISLANDNY 24431067118400838000056 CKCD 5812 XXXXXXXXXXXX0057 XXXX XXXX XXXX 0057 | -60.02 |
| 05/01/17 | CHECKCARD  0428 IR NEXIA INTELLIGENCE L 877-288-7707 TX 24431067119286498506212 CKCD 7399 XXXXXXXXXXXX0057 XXXX XXXX XXXX 0057 | -9.99 |
| 05/01/17 | CHECKCARD  0428 MUSCLE MAKER GRILL - S STATEN ISLANDNY 24269797119000919364849 CKCD 5814 XXXXXXXXXXXX0057 XXXX XXXX XXXX 0057 | -25.05 |
| 05/01/17 | CHECKCARD  0428 VERIZON*RECURRING PAY 800-VERIZON  FL 24692167118000628883836 RECURRING CKCD 4899 XXXXXXXXXXXX0057 XXXX XXXX XXXX 0057 | -264.28 |
| 05/01/17 | CHECKCARD  0429 AMAZON MKTPLACE PMTS AMZN.COM/BILLWA 24692167119000381834132 CKCD 5942 XXXXXXXXXXXX0057 XXXX XXXX XXXX 0057 | -25.98 |
| 05/01/17 | CHECKCARD  0429 SPK*SPOKEO SEARCH 800-6994264  CA 24906417119038844505163 RECURRING CKCD 5968 XXXXXXXXXXXX0057 XXXX XXXX XXXX 0057 | -22.90 |
| 05/01/17 | CHECKCARD  0429 DELTA AIR  00623814106 DELTA.COM   CA 24717057120871200364928 CKCD 3058 XXXXXXXXXXXX0057 XXXX XXXX XXXX 0057 | -448.40 |

*continued on the next page*

10:16 PM

04/24/20

Cash Basis

# Abruzzi Investments, LLC
## Account QuickReport
### All Transactions

| Type | Date | Num | Name | Memo | Split | Original Amount | Paid Amount |
|------|------|-----|------|------|-------|-----------------|-------------|
| **11000 · Investments** | | | | | | | |
| **11100 · Constellation Healthcare** | | | | | | | |
| Check | 06/13/2013 | DM | Robinson Brog Leinwand Greene | Constellation Healthcare Investment | 10013 · Abr... | 4,000,000.00 | 4,000,000.00 |
| Deposit | 05/25/2017 | | Robinson Brog Leinwand Greene | Loan Constellation Paul | 10013 · Abr... | -250,000.00 | -250,000.00 |
| Check | 06/29/2017 | | Sunshine Star LLC | Loan Repay Constellation - Paul | 10013 · Abr... | 250,000.00 | 250,000.00 |
| Total 11100 · Constellation Healthcare | | | | | | | 4,000,000.00 |
| Total 11000 · Investments | | | | | | | 4,000,000.00 |
| **TOTAL** | | | | | | | 4,000,000.00 |


Exhibit
PET 0020

10:16 PM

04/24/20

Cash Basis

## Abruzzi Investments, LLC
## Account QuickReport
### All Transactions

Balance

4,000,000.00
3,750,000.00
4,000,000.00

4,000,000.00

4,000,000.00

4,000,000.00

ABRUZZI 000012